**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**No. 99-11300**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee**

**v.**

**ALEJANDRO JIMENEZ-NAVA,**

**Defendant-Appellant,**

---

Appeal from the United States District Court for the
Northern District of Texas

---

February 26, 2001

Before JOLLY, JONES, and SMITH, Circuit Judges

EDITH H. JONES, Circuit Judge:

Alejandro Jimenez-Nava ("Jimenez-Nava") appeals from his conviction for possession of counterfeit immigration-related documents in violation of 18 U.S.C. § 1546(a). He entered a conditional plea of guilty, reserving the right to appeal the district court's denial of his pretrial motion to suppress. He now argues that the Vienna Convention on Consular relations ("Vienna Convention"), April 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820, bestows on foreign nationals individual rights, that his rights were violated, and that exclusion of his incriminating

statements to immigration agents is the appropriate remedy.  We disagree and affirm his conviction.

## I.  BACKGROUND[1]

On March 7, 1999, Immigration and Naturalization Service ("INS") agents, suspecting that Jimenez-Nava was involved in making fraudulent immigration documents, went to his apartment and introduced themselves.  After one agent asked Jimenez-Nava, in Spanish, about his immigration status, Jimenez-Nava admitted that he was an illegal alien from Mexico.  The agent ascertained that Jimenez-Nava had no immigration documents, placed him under arrest and read him his <u>Miranda</u> rights in Spanish.  Jimenez-Nava did not invoke <u>Miranda</u> rights and consented to a search of his apartment.

During the search, Jimenez-Nava was given his <u>Miranda</u> warnings a second time and advised that he could tell the agents to stop at any time.  Jimenez-Nava allegedly told the agents that he would show them where the fraudulent documents were made.  At the end of the search, Jimenez-Nava signed a consent-to-search form and was transported to INS to be processed.  Jimenez-Nava later stated at the suppression hearing that he had not wanted to sign this form.

At INS, Jimenez-Nava was processed by a different agent who spent twenty to twenty-five minutes with him.  Jimenez-Nava was

---

[1]     This recitation of facts derives from the suppression hearing.

given a standard INS notice of rights form written in Spanish that advised him of his right to legal representation and right to communicate with a consular officer of his country. Jimenez-Nava's initials appear on this notice of rights, next to a box that he checked, admitting that he was in the United States illegally and that he waived his right to a hearing before a judge. His signature also appears on a standard INS processing form.

Subsequently, one of the agents who arrested Jimenez-Nava returned to the INS and asked Jimenez-Nava to take him to a document lab. Jimenez-Nava showed them to an apartment and orally agreed to a search of it. Jimenez-Nava now denies that he gave consent.

After this search, the agents returned with Jimenez-Nava to the INS office, continued to question him, and once again gave him his <u>Miranda</u> rights. An agent then wrote Jimenez-Nava's statement: he was from Hidalgo, Mexico and admitted he was not a United States citizen; he discussed how he entered this country and his plans to work for a man named Miguel Hernandez by selling false immigration and social security cards. At some point, Jimenez-Nava refused to answer further questions and ended the interview.

Jimenez-Nava testified at the suppression hearing that he was shown the form informing him that he could speak to a consular officer after he was asked questions about Hernandez and the

selling of fraudulent documents. During cross-examination, Jimenez-Nava testified that after each of three <u>Miranda</u> warnings, he declined to request a lawyer. He admitted that he knew, from the form, that he could have access to a Mexican consular official, but he did not want one. However, he also testified that he did not know the function of consular officers and that he did not want to speak to the consular officer because the agents were treating him like an immigrant and he was not concerned about being deported. He stated that he would have wanted to contact a consular official had he known that he had a right to speak to one about the document fraud investigation.

The suppression hearing was convened because, after his indictment, Jimenez-Nava contended that he was prejudiced by a violation of his treaty rights under the Vienna Convention. He requested suppression of his statements to the INS agents and the evidence taken from the search at the second apartment. The district court denied relief, ruling both that the treaty does not require suppression and that Jimenez-Nava consented to the apartment search. Jimenez-Nava entered a conditional guilty plea. He was sentenced to a twenty-four month term of imprisonment and three years' supervised release. Jimenez-Nava has timely appealed the court's application of the Vienna Convention.

## II.  DISCUSSION

This court reviews a district court's interpretation of a treaty de novo.  <u>Kreimerman v. Casa Veerkamp</u>, 22 F.3d 634, 639 (5th Cir. 1994).

The Vienna Convention is a 79-article, multilateral treaty negotiated in 1963 and ratified by the United States in 1969.  *See* <u>United States v. Lombera-Camorlinga</u>, 206 F.3d 882, 884 (9th Cir. 2000).  Mexico is a signatory nation.  The treaty governs "the establishment of consular relations, [and] defin[es] a consulate's functions in a receiving nation."  <u>United States v. Alvarado-Torres</u>, 45 F. Supp.2d 986, 988 (S.D. Cal. 1999).  Jimenez-Nava asserts that Article 36 of the treaty bestows a private, judicially-enforceable right on foreign nationals to consult with consular officials.  He argues that because this right was violated, his post-arrest statements and tangible evidence should have been suppressed.  These are issues of first impression for this circuit.  *See* <u>Flores v. Johnson</u>, 210 F.3d 456, (5th Cir. 2000).[2]

---

[2]    In <u>Faulder v. Johnson</u>, 81 F.3d 515 (5th Cir. 1996), this court stated that the treaty requires an arresting government to notify a foreign national of his right to contact his consul.  However, this court found the violation of the Convention to be harmless error, not meriting reversal.  This court later stated in <u>Flores</u> that "[w]e do not read our opinion in <u>Faulder</u> as recognizing a personal right under the Convention.  Rather, the panel dispatched the claim with its conclusion that any violation was harmless.  Any negative implication inherent in rejecting the claim as harmless lacks sufficient force to support a contention that the panel held that the Convention created rights enforceable by individuals."  <u>Flores</u>, 210 F.3d at 457.  This court likewise did not reach the merits of this question in <u>Flores</u> because the defendant's assertion was at best

## A. Whether The Vienna Convention Confers An Enforceable Individual Right

Ratified treaties become the law of the land on an equal footing with federal statutes. U.S. Const. art. VI, cl. 2. They are to be construed initially according to their terms. United States v. Alvarez-Machain, 504 U.S. 665, 663, 112 S.Ct. 2188, 2193 (1992). Treaty construction is a particularly sensitive business because international agreements should be consistently interpreted among the signatories. "Treaties are contracts between or among independent nations." United States v. Zabaneh, 837 F.2d 1249, 1261 (5th Cir. 1988). As such, they do not generally create rights that are enforceable in the courts. United States v. Li, 206 F.3d 56, 60 (1st Cir. 2000); *see also* Goldstar v. United States, 967 F.2d 965, 968 (4th Cir. 1992) ("International treaties are not presumed to create rights that are privately enforceable"); Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved.").[3]

---

Teague-barred. *Id.*

[3]      "[E]ven where a treaty provides certain benefits for nationals of a particular state -- such as fishing rights - it is traditionally held that any rights arising out of such provisions are, under international law, those of the state and . . . individual rights are only derivative through the states." United States v. Gengler, 510 F.2d 62, 66 (2d Cir. 1974). *See also* United States v. Rosenthal, 793 F.2d 1214, 1232 (11th Cir. 1986) (finding no merit in the defendants' argument that the actions of the United States violated its extradition treaty with Colombia because "[u]nder international law it is the

For enforcement of its provisions, a treaty depends "on the interest and honor of the governments which are parties to it." Head Money Cases, 112 U.S. 580, 598, 5 S.Ct. 247 , 254 (1884). "[I]nfraction becomes the subject of international negotiations and reclamations." *Id*. ("It is obvious that with all this the judicial courts have nothing to do and can give no redress."). *See also* United States v. Williams, 617 F.2d 1063, 1090 (5th Cir. 1980)("[R]ights under international common law must belong to sovereign nations, not to individuals, just as treaty rights are the rights of the sovereign.").

Against the backdrop of these general principles, the Vienna Convention appears to be a standard treaty whose purpose is to facilitate consular activity in receiving states. The Preamble states:

> Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems, [and] Realizing that the purpose of such privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States . . . (emphasis added).

This language would appear to preclude any possibility that individuals may benefit from it when they travel abroad, even,

---

contracting foreign government that has the right to complain about a violation").

perhaps, if they are among the consular corps.  Moreover, only one

article out of 79 in the Treaty even arguably protects individual

non-consular officials.  Article 36, titled "Communication and

Contact With Nationals of Receiving State," provides:

> 1.  With a view to facilitating the exercise of consular
> functions relating to nationals of the sending State:
> . . .
>
> (b) if he so requests, the competent authorities of the
> receiving State shall, without delay, inform the consular
> post of the sending State if, within its consular
> district, a national of that State is arrested or
> committed to prison or to custody pending trial or is
> detained in any other manner.  Any communication
> addressed to the consular post by the person arrested, in
> prison, custody or detention shall also be forwarded by
> the said authorities without delay.  The said authorities
> shall inform the person concerned without delay of his
> rights under this sub-paragraph;
>
> (c) consular officers shall have the right to visit a
> national of the sending State who is in prison, custody
> or detention, to converse and correspond with him and to
> arrange for his legal representation.  They shall also
> have the right to visit any national of the sending State
> who is in prison, custody or detention in their district
> in pursuance of a judgment.  Nevertheless, consular
> officers shall refrain from taking an action on behalf of
> a national who is in prison, custody or detention if he
> expressly opposes such action.
>
> 2.  The rights referred to in paragraph 1 of this Article
> shall be exercised in conformity with the laws and
> regulations of the receiving State, subject to the
> proviso, however, that the said laws and regulations must
> enable full effect to be given to the purposes for which
> the rights accorded under this Article are intended.

Principally because of the references to "rights" in Article 36, the circuit courts have so far declined to decide whether the Vienna Convention intended to enact individually enforceable rights of consultation.[4] The Supreme Court, *in dicta*, has also held the question open. <u>Breard v. Greene</u>, 523 U.S. 371, 376, 118 S.Ct. 1352, 1355 (1998).

A strong argument has been made that such diffidence is unnecessary and that the Vienna Convention is not ambiguous as to whether it creates private rights. In <u>Li</u>, Judges Selya and Boudin stated:

> Nothing in [the] text explicitly provides for judicial enforcement of . . . consular access provisions at the behest of private litigants. Of course, there are references in the treaties to a 'right' of access, but these references are easily explainable. The contract States are granting each other rights, and telling future detainees that they have a 'right' to communicate with their consul is a means of implementing the treaty obligations as between States. Any other way of phrasing the promise as to what will be said to detainees would be artificial and awkward.

<u>Li</u>, 206 F.3d at 60, 66. (Selya, J. & Boudin, J., concurring). In any event, as these judges pointed out, even if the treaty is ambiguous, the presumption against implying private rights comes

---

[4] *See* <u>United States v. Page</u>, 2000 WL 1682523, *3 (6th Cir. 2000); <u>United States v. Chanthadara</u>, 2000 WL 1637516 (10th Cir. 2000); <u>United States v. Chaparro-Alcantara</u>, 2000 WL 1182450, *4 (7th Cir. 2000); <u>United States v. Cordoba-Mosquera</u>, 212 F.3d 1194 (11th Cir. 2000); <u>United States v. Li</u>, 206 F.3d 56 (1st Cir. 2000)(en banc); <u>United States v. Lombera-Camorlinga</u>, 206 F.3d 882, 885 (9th Cir. 2000)(en banc); <u>United States v. Cordoba-Mosquera</u>, 202 F.3d 1194 (11th Cir. 2000).

into play.  Finally, as both the majority and concurring judges in Li recognized, the U.S. State Department has consistently taken the position that the Vienna Convention does not establish rights of individuals, but only state-to-state rights and obligations.  The State Department's view of treaty interpretation is entitled to substantial deference.  Li, 206 F.3d 63-66.

Jimenez-Nava's arguments in support of individually enforceable rights ultimately emphasize the treaty's ambiguity. First, by dwelling on the plain language concerning "rights" in Article 36, Jimenez-Nava must discount the equally plain language in the Preamble that the treaty's purpose "is not to benefit individuals".  Appellant would confine the limitation to consular officials, but that interpretive route hardly assists him, since consular officials are the specific beneficiaries of many of the treaty provisions.[5]  If the treaty cannot benefit them by creating individually enforceable rights, how can it intend to confer enforceable rights on all foreign nationals detained in the receiving state?

---

[5]    *See e.g.* Vienna Convention, Art. 27 (providing for the protection of the consular premises and archives in exceptional circumstances); Art. 34 (ensuring freedom of movement and travel to all members of consular post); Art. 35 (protecting freedom of communication for the consular post); Art. 41 (providing personal inviolability of consular officers); Art. 43 (providing immunity from jurisdiction for consular officers or employees with certain exceptions); Art. 44(detailing under what conditions consular post members either should or alternatively, may refuse to, give evidence in the course of judicial or administrative proceedings).

Second, while acknowledging the general rule against implication of personal rights in treaties, Jimenez-Nava notes that, like any agreement, treaties may explicitly confer individual rights.[6] He cites as an example Supreme Court's construction of an extradition treaty in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234 (1886). That case is inapposite, however, for an explicit purpose of the treaty in Rauscher was to govern "the giving up of criminals, fugitives from justice in certain cases". Id. At 410, 7 S.Ct. at 236. Unlike the Vienna Convention, the purpose and provisions of the extradition treaty related directly to the individual right asserted. Id. at 410, 7 S.Ct. at 236.[7] Rauscher demonstrates at most the necessity for careful interpretation of each treaty.[8]

---

[6] In the Head Money Cases, the Court stated that treaties may contain provisions which confer certain rights, but it implied that these are limited to matters concerning "municipal law" that "are capable of enforcement as between private parties in the courts of the country." Head Money, 112 U.S. at 598, 5 S.Ct. at 254. "An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens." Id.

[7] The Supreme Court later distinguished Rauscher on additional grounds, pointing both to Rauscher's reliance on the federal statutes and that the Court implied a term in the treaty "because of the practice of nations with regard to extradition treaties." United States v. Alvarez-Machain, 504 U.S. 655, 660, 667, 112 S.Ct. 2188, 2191, 2198 (1992). Neither of these factors is present in the instant case.

[8] Based upon this language and purpose, the Court has easily rejected a claim that two treaties providing that a nation "shall indemnify" or shall compensate private parties for certain damage inflicted on the high seas thereby created private rights of action cognizable in United States courts. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 442, 109 S.Ct. 683, 692 (1989). The Court described these treaties as setting forth "only" substantive rules of conduct, not private rights of action. Id.

-11-

In his final thrust, Jimenez-Nava points out that the State Department's manual on the treatment of foreign nationals advises arresting officers to inform detainees of their right to consular communication pursuant to the treaty. U.S. Dept. Of State, Foreign Affairs Manual § 411 (1994). Further, a "Memorandum of Understanding on Consular Protection of Mexican and United States Nationals" was entered into between this country and Mexico to adopt procedures and views concerning communication between consuls and foreign nationals. Memorandum of Understanding, May 7, 1996, Dept. of State File No. P96 0065-0984/0987. Such documents do no more than express this country's laudable determination to abide by the treaty. But the implementation of the treaty by the Federal government is wholly different from the implication that it may be enforced in court by individual detainees.

The sum of Jimenez-Nava's arguments fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation between a detained foreign national and his consular office. Thus, the presumption against such rights ought to be conclusive. If this conclusion suffers from any defect, however, it is beyond dispute -- among the federal circuit courts -- that analogizing the proffered right to consult with <u>Miranda</u> rights is utterly unfounded.

**B.    The Exclusionary Rule Is Not An Appropriate Remedy**

Jimenez-Nava argues that his right of consular communication and notification is a "fundamental right," analogous to the Fifth and Sixth Amendment, which merits protection through use of the exclusionary rule.  He contends that the terms of the Vienna Convention require courts to elect a remedy to "enable full effect to be given to the purposes for which the rights accorded under [Article 36] are intended."  Vienna Convention, Art. 36(2).  "Full effect," he argues, requires exclusion in criminal prosecutions of statements given without appropriate information about consultation rights.

All of our sister circuits have held that suppression of evidence is not a remedy for an Article 36 violation.  *See e.g.* United States v. Lawal, 2000 WL 1647914 (7ᵗʰ Cir. 2000); Cordoba-Mosquera, 212 F.3d at 1195-96; Lombera-Camorlinga, 206 F.3d at 886; Li, 206 F.3d at 60; and cases cited at n.4 supra.  "The exclusionary rule was 'not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law, but rather to protect specific, constitutionally protected rights.'" United States v. Page, 2000 WL 1682523, *3 (6ᵗʰ Cir. 2000).  We agree that "there is no indication that the drafters of the Vienna Convention had these 'uniquely American rights in mind, especially given the fact that even the United States Supreme Court did not

-13-

require Fifth and Sixth Amendment post-arrest warnings until it decided <u>Miranda</u> in 1966, three years after the treaty was drafted." <u>Page</u>, 2000 WL 1682523, at 3 (citing <u>Lombera-Camorlinga</u>, 206 F.3d at 886); *see also* Erik G. Luna & Douglas J. Sylvester, <u>Beyond Breard</u>, 17 Berkeley J. Int'l L. 147, 179 (1999) ("It would take an enormous leap in logic, therefore, to argue that the signatories to the Vienna Convention intended for violations to be cured by the exclusion of evidence or the dismissal of charges."). Absent an express provision in the treaty, the exclusionary rule is an inappropriate sanction. <u>Page</u>, 2000 WL 1682523 at *3; *see also* <u>Chaparro-Alcantara</u>, 2000 WL 1182450 at *4 ("Upon examination of the text . . . it is clear that nothing in the text of the Vienna Convention indicates that a remedy of suppression is appropriate for violations of Article 36.").

Were this court to hold that the text of the treaty creates an individual right and then impose a remedy equal to that imposed when defendants are not given their <u>Miranda</u> warnings -- the remedy of suppression -- we would be ignoring the directive of <u>Dickerson v. United States</u>, 530 U.S. 428, 120 S.Ct. 2326 (2000). The Supreme Court there stated that "<u>Miranda</u> and its progeny in this Court *govern* the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. at _____, 120 S.Ct. at 2329-30 (emphasis added). And the

-14-

Court added that "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare.'" *Id*. at 2338 (quoting <u>Berkermer v. McCarty</u>, 468 U.S. 420, 104 S.Ct. 3138 (1984)). Neither of these criteria is met in the instant case. First, "[a]pplication of the exclusionary rule is only appropriate when the Constitution or a statute requires it." <u>U.S. v. Chaparro-Alcantara</u>, 226 F.3d at 620. The Vienna Convention, which has the force of a statute, contains no such requirement. Moreover, where <u>Miranda</u> warnings have been given, three times no less, we will not create a rule that increases the risk that a guilty defendant, who is aware of his rights under the U.S. Constitution and as articulated by the Supreme Court, go free.

Jimenez-Nava argues that suppressing his statements constitutes the only effective method of enforcing the treaty. Article 36 does not articulate a specific remedy. The treaty states that the rights of consultation "shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." Vienna Convention, Art. 36(2). The treaty leaves implementation to the

discretion of each signatory state so long as its "purposes" to ensure free communication and access are given full effect. "Yet, the treaty does not link the required consular notification in any way to the commencement of police interrogation. Nor does the treaty, as <u>Miranda</u> does, require law enforcement officials to cease interrogation once the arrestee invokes his right." <u>Lombera-Camorlinga</u>, 206 F.3d at 886. Suppressing evidence in a criminal trial does not further the treaty's purposes.[9]

Finally, most countries do not have a suppression remedy. *See* Luna, 17 Berkeley J. Int'l L. at 177 ("Legal rules suppressing relevant, probative evidence from criminal trials are far and few between outside of the United States. Continental legal systems are generally silent as to the admissibility of evidence obtained by improper legal techniques."). No other signatories to the Vienna Convention have suppressed statements under similar circumstances and two have rejected this remedy. *See* <u>Lombera-Camorlinga</u>, 206 F.3d at 888. If suppression becomes the remedy in the United States, the treaty would have an inconsistent meaning among the signatory nations. Thus, refusing to resort to the

---

[9]    The State Department also asserts that suppression is an inappropriate remedy. *See* <u>Lombera-Camorlinga</u>, 206 F.3d at 886 ("The State Department indicates that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary.").

exclusionary rule promotes "harmony in the interpretation of an international agreement."[10]

## IV.  CONCLUSION

For the foregoing reasons,[11] the district court did not err by denying Jimenez-Nava's motion to suppress.

**AFFIRMED.**

---

[10]     Lombera-Camorlinga, 206 F.3d at 888 (citing Restatement (Third) of Foreign Relations § 325 cmt. d ("Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems.")); *see also* Chaparro-Alcantara, 2000 WL 1182450 at *4 ("We also note that to impose judicially such a drastic remedy, not imposed by any other signatory to this convention, would promote disharmony in the interpretation of an international agreement.")(citing Restatement (Third) of Foreign Relations Law § 325 cmt. d (1987)).

[11]     This analysis renders it unnecessary to construe the "without delay" provision of the Article 36.