COMMONWEALTH *VS.* SVEN OLAF DIEMER.

No. 01-P-845.

Norfolk. November 19, 2002. - March 27, 2003.

Present: JACOBS, CYPHER, & KANTROWITZ, JJ.

*Vienna Convention. Alien. Homicide. Accessory and Principal. Evidence,* Redirect examination, Prior consistent statement, Prior misconduct. *Witness,* Redirect examination. *Practice, Criminal,* Instructions to jury.

Where a criminal defendant (a German citizen) charged with being an accessory after the fact to murder was not permitted to speak with the German consulate, in violation of the Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (1969), this court concluded that, regardless whether the Vienna Convention confers individual rights, the violation did not require suppression of the defendant's statements, in that the defendant did not demonstrate that he was prejudiced by the violation. [681-687]

At a criminal trial, the judge acted within his discretion in admitting in evidence, as a prior consistent statement, testimony given on redirect examination regarding a witness's statement to police officers, where a claim had been made that the witness's in-court statement was of recent contrivance. [687-688]

At a criminal trial, the judge properly admitted evidence of the defendant's prior bad act, which tended to demonstrate the relationship between the defendant and another, and was probative of the defendant's intent and motive. [688-689]

The judge at a criminal trial did not err in failing to give a requested instruction to the jury, where the instructions that the judge gave were sufficient; the judge was not required to use particular words or give an instruction on every subsidiary fact and possible inference. [689]

INDICTMENT found and returned in the Superior Court Department on January 5, 1999.

A pretrial motion to suppress evidence was heard by *James F. McHugh,* J., and the case was tried before *Thomas E. Connolly,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Robert M. Tutino,* Committee for Public Counsel Services, with him) for the defendant.

*Tracey A. Cusick,* Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Sam Silverman & John Reinstein* for American Civil Liberties Union of Massachusetts.

*Valerie C. Epps* for International Law Association (American Branch).

*Francis J. O'Rourke* for Federal Republic of Germany.

*Thomas F. Reilly,* Attorney General, *Pamela L. Hunt & Emily R. Paradise,* Assistant Attorneys General, for the Attorney General.

KANTROWITZ, J. The issue of significance[1] concerns the appropriate remedy for a violation of Article 36 of the Vienna Convention on Consular Relations (Article 36).[2] We hold that, in the circumstances of this case, suppression of statements is not warranted and accordingly affirm the defendant's conviction.[3]

*Background.* The defendant, Sven Olaf Diemer, a citizen of the Federal Republic of Germany, was charged with being an accessory after the fact to murder, G. L. c. 274, § 4, the murder having been committed by one Heath Saffores some time in the late hours of May 22 or in the early morning hours of May 23, 1998. Diemer filed a motion to suppress statements on the ground that the Florida and Massachusetts police failed to inform him of his right to consular notification under Article 36 of the Vienna Convention. After a three-day hearing, the motion was denied. The judge found that, while there was a violation of the Vienna Convention, the defendant had not been prejudiced, and suppression was not the appropriate remedy. Following a fifteen-day jury trial, Diemer was convicted.

---

[1]The other issues raised are that the trial judge (1) improperly admitted in evidence (a) a prior consistent statement of a Commonwealth witness; and (b) a prior bad act by Diemer; and (2) refused to give a requested jury instruction.

[2]See Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (1969).

[3]We gratefully acknowledge the filing of amicus curiae briefs by the Federal Republic of Germany; the American Civil Liberties Union of Massachusetts; the International Law Association (American Branch); and the Attorney General (whose brief was filed after oral argument).

*Factual background.* Diemer speaks multiple languages, including English. He arrived in Boston in February, 1998, and befriended Heath Saffores, a native of North Carolina. Saffores was living with his girlfriend, Kim Magnarelli, at the time in Holbrook.

On the evening of Friday, May 22, 1998, the start of the Memorial Day weekend, Saffores and Magnarelli went to the University of Massachusetts graduation ball in Cambridge. This was the last time that she was seen or heard from.

On May 29, Diemer and Saffores left for North Carolina with some of Magnarelli's belongings, including her car, dog and laptop computer. Saffores abandoned the dog in a wooded area and threw her computer from his moving vehicle. The two stayed in North Carolina, spending time with a childhood friend of Saffores, Richard Hudson, until June 1, before traveling to Florida, Texas, Mexico, and El Salvador, where, apparently, Saffores was killed in an automobile accident in August.

Diemer returned to North Carolina alone on August 16, 1998, and after learning that the local authorities were interested in speaking with him, contacted the sheriff's office and met with them that same day. The Massachusetts State police were notified and Trooper John Sylva and two colleagues traveled to North Carolina to speak with Diemer. On all occasions English was spoken, there being no language barrier. At the time, Diemer was viewed as a witness, not a suspect.

On August 16 and 17, 1998, Diemer stated that he did not know where Magnarelli was. The next day, Diemer changed his story and told the officers that on July 2, while in El Salvador, Saffores had admitted to Diemer that he had killed Magnarelli after the graduation ball and buried her body in the basement of their house. At a further interview two days later, Diemer provided a detailed account of the events following the Memorial Day weekend, which, while not fully accurate, included his and Saffores's preparation for, trip to, and time spent in North Carolina and their travels after. Diemer stated that Saffores had originally told him Magnarelli was away with friends. However, he also claimed that he believed Saffores had admitted to Hudson that he had killed Magnarelli.

With this information, the police returned to Hudson for what

would be a second interview. In his first interview, which had taken place in early June, Hudson had said he had seen Saffores and Diemer, who had left a car and some tools at his house, but they had subsequently left and he did not know where they had gone. In contrast, on August 21, Hudson changed his story significantly, claiming that, in a three-way conversation, not only did Saffores admit killing Magnarelli,[4] but Diemer discussed his involvement in assisting his friend avoid detection.[5]

The police commenced an unsuccessful search for Diemer, who had departed for parts unknown, despite earlier police requests that he not do so. As a result of a routine traffic stop in Florida on November 6, 1998, Diemer was taken into custody, on an arrest warrant for accessory after the fact to murder.

Trooper John Sylva and two Massachusetts State police sergeants traveled to Florida to escort Diemer back to Massachusetts. Trooper Sylva gave Diemer his Miranda rights, the third time Diemer had received them.[6] He was not, however, ever informed of his rights under the Vienna Convention.

On the trip to Massachusetts, Trooper Sylva and Diemer engaged in "continuous conversation." Their conversation was friendly, involving a variety of topics, including Magnarelli's death. Diemer again stated that Saffores admitted to the killing. Significantly, however, he indicated that the date of this discussion was Wednesday, May 27, contrary to his prior statements

---

[4]Hudson testified that Saffores told him that, after returning from a night out, Magnarelli started yelling at him. Saffores struck her in the face, hard enough that she wanted to seek medical attention. His retort, "You're not going anywhere, bitch," escalated into his strangling her. After she died, he rolled her body in a rug and put her in a closet. (Ultimately, the police found her in the basement.)

[5]Diemer allegedly made comments about cleaning the house with Saffores; being troubled about a blood stain that was ingrained in the wood as "[t]hey'll be able to spot it" and "[w]e couldn't get it off"; the need to get out of the country; and being worried that police dogs would find the body. Hudson further stated that either Saffores or Diemer, he could not remember who, talked about burning rags that they had used to clean the house and burying Magnarelli's pocketbook.

[6]In addition to Trooper Sylva's recitation, Diemer was also advised of his Miranda rights twice by Sergeant Osborne of the Nassau County, Florida, sheriff's office. Diemer indicated that he understood his rights, an assertion the motion judge credited.

to the police that he did not learn of the killing until July 2. He also discussed assisting Saffores, e.g., cleaning Magnarelli's house, packing, burying, and burning her belongings and attempting to get Saffores out of the country.

On March 11, 1999, the German Consulate in Miami advised the Florida Department of State that Article 36 of the Vienna Convention may have been violated because Diemer was not advised of his right to have the consulate notified of his detention. The Florida Department of State apologized. On May 6, 1999, the German Consulate in Boston advised defense counsel that "no further reaction from the Florida Department of State is to be expected beyond the above-mentioned apology."

*Article 36 of the Vienna Convention.* "The Vienna Convention is a 79-article, multilateral treaty negotiated in 1963 and ratified by the United States in 1969." *United States* v. *Jimenez-Nava,* 243 F.3d 192, 195 (5th Cir.), cert. denied, 533 U.S. 962 (2001). "[The treaty] governs the establishment of consular relations between nations and defines the functions of a consulate." *United States* v. *Emuegbunam,* 268 F.3d 377, 388 (6th Cir. 2001), cert. denied, 535 U.S. 977 (2002). "Having been so ratified, it became 'law of the Land' under the Supremacy Clause of the Constitution. U.S. Const. art. VI, cl. 2." *United States* v. *Torres-Del Muro,* 58 F. Supp. 2d 931, 932 (C.D. Ill. 1999).

Article 36 sets out the procedure to be followed when a foreign national is arrested. In pertinent part, it states, "if [the defendant] so requests, the competent authorities of the receiving State [here, the United States] shall, without delay, inform the consular post of the sending State [here, Germany] if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. . . . The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." Article 36(1)(b).[7] If the detainee requests notification, and the consular post is accordingly contacted, an officer from the

---

[7]There is a mandatory notification procedure for some countries, in which case the consulate is automatically informed of an arrest, regardless of a request for notification by the detainee. Germany is not one of those countries.

consular post "shall be free to communicate with [the detainee] and to have access to [him]. . . . [Further, the officer] shall have the right to visit . . . converse and correspond with [the detainee] and to arrange for his legal representation." Article 36(1)(a), (c).

The treaty is silent as to the remedy if this notification is not provided and the detainee is subsequently charged and convicted of a crime. Two issues arise in such a scenario. First, does the treaty confer an individual right that a detainee may pursue? If so, what is the remedy for a violation of that right? There is no Massachusetts case law on the issue. Several other jurisdictions, however, have weighed in on the debate. Generally, three separate options have been advanced: (1) Article 36 does create individually enforceable rights[8]; (2) Article 36 does *not* create such rights[9]; and (3) the issue need not be decided, because even if such rights are created, suppression of evidence is not a remedy for its violation.[10] The Supreme Court has withheld judgment thus far on the issue, although it was tangentially

---

[8]See *United States* v. *Hongla-Yamche*, 55 F. Supp. 2d 74, 78 (D. Mass. 1999); *United States* v. *Torres-Del Muro*, 58 F. Supp. 2d 931, 933 (C.D. Ill. 1999). But see *United States* v. *Li*, 206 F.3d 56, 60 (1st Cir.), cert. denied sub nom. *Mao Bing Mu* v. *United States*, 531 U.S. 956 (2000). See also the *LaGrand Case* (*Federal Republic of Germany* v. *United States*), 2001 I.C.J. 104 (June 27). The effect of the *LaGrand* decision in the United States is unclear, as the Supreme Court has not had occasion to interpret Article 36 since the *LaGrand* decision was rendered. The Supreme Court has previously stated that "while we should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such, it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State." *Breard* v. *Greene*, 523 U.S. 371, 375 (1998). Most courts which have addressed the issue post *LaGrand* have given the decision little deference. See, e.g., State *vs.* Navarro, Wis. Ct. App., No. 02-0850-CR (Feb. 19, 2003). But see *United States ex rel. Madej* v. *Schomig*, 223 F. Supp. 2d 968, 979 (N.D. Ill. 2002).

[9]See *United States* v. *Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir.), cert. denied, 533 U.S. 962 (2001); *United States* v. *Emuegbunam*, 268 F.3d 377, 392, 394 (6th Cir. 2001), cert. denied, 535 U.S. 977 (2002); *State* v. *Martinez-Rodriguez*, 131 N.M. 47, 54 (2001), cert. denied, 535 U.S. 937 (2002).

[10]See *United States* v. *Li*, 206 F.3d at 60; *United States* v. *Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir.), cert. denied, 531 U.S. 991 (2000); *United States* v. *Chaparro-Alcantara*, 226 F.3d 616, 621 (7th Cir.), cert. denied, 531 U.S. 1026 (2000).

Additionally, some courts have taken the position that even if the treaty

raised in *Breard* v. *Greene*, 523 U.S. 371 (1998), a capital case in which the Court refused to issue a stay of execution. The Court observed that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." *Id.* at 376.

We shall briefly review the rationale for each of the positions.

Those asserting that the treaty confers individual rights (including amicus curiae International Law Association) reason that an aggrieved person has standing in court to raise the violation of his treaty rights and to request a remedy. In addition to noting the observation of the Supreme Court in *Breard* v. *Greene, supra,* they rely on the plain language of the last sentence of Article 36(b): "The said authorities shall inform the person concerned without delay *of his rights* under this subparagraph" (emphasis supplied). "Were we dealing with such text in a statute originally enacted by Congress rather than this species of 'Law of the Land,' is there any doubt as to how this provision would be interpreted?" *United States* v. *Li,* 206 F.3d 56, 71 (1st Cir.), cert. denied sub nom. *Mao Bing Mu* v. *United States,* 531 U.S. 956 (2000) (Torruella, C.J., concurring in part; dissenting in part). When faced with the issue, the International Court of Justice held that Article 36 "creates individual rights." *LaGrand Case* (*Federal Republic of Germany* v. *United States*), 2001 I.C.J. 104, par. 77, 89 (June 27).

The counter argument is the general rule that "international treaties do not create rights that are privately enforceable in the federal courts." *United States* v. *Emuegbunam,* 268 F.3d at 389.

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. If these fail, its infraction becomes the subject

confers individual rights, and even if suppression *could* be an appropriate remedy, no relief would be afforded where the defendant failed to demonstrate prejudice from the violation of his alleged treaty rights. See *United States* v. *Cordoba-Mosquera,* 212 F.3d 1194, 1196 (11th Cir. 2000), cert. denied sub nom. *Zuniga* v. *United States,* 531 U.S. 1131 (2001); *United States* v. *Chanthadara,* 230 F.3d 1237, 1255-1256 (10th Cir. 2000), cert. denied, 534 U.S. 992 (2001); *United States* v. *Ortiz,* 315 F.3d 873, 886-887 (8th Cir. 2002); *Bell* v. *Commonwealth,* 264 Va. 172, 188-189 (2002), cert. denied, 537 U.S. 1123 (2003).

of international negotiations and reclamation, so far as the injured parties choose to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress."

*Ibid.*, quoting from *Edye* v. *Robertson* (*Head Money Cases*), 112 U.S. 580, 598 (1884).

"It is common ground that the treat[y] in question [is an] agreement[] among sovereign States. Nothing in [its] text explicitly provides for judicial enforcement of [its] consular access provisions at the behest of private litigants. Of course, there are references in the treat[y] to a 'right' of access, but these references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a 'right' to communicate with their consul is a means of implementing the treaty obligations *as between States*. Any other way of phrasing the promise as to what will be said to detainees would be both artificial and awkward" (emphasis original). *United States* v. *Li*, 206 F.3d at 66 (Selya and Boudin, JJ., concurring).

Proponents of this view also cite the preamble to the treaty as "expressly disclaim[ing] the creation of any individual rights: '[T]he purpose of such privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States.' Vienna Convention, 21 U.S.T. at 79, 596 U.N.T.S. at 262 (emphasis added)." *United States* v. *Emuegbunam*, supra at 392. See *Bell* v. *Commonwealth*, 264 Va. 172, 187-188 (2002), cert. denied, 537 U.S. 1123 (2003) (Virginia Supreme Court, in interpreting *LaGrand*, concluded that "the [International Court of Justice], contrary to Bell's assertion, did not hold that Article 36 of the Vienna Convention creates legally enforceable individual rights that a defendant may assert in a state criminal proceeding to reverse a conviction. Instead, the [court] stated that 'Article 36, paragraph 1, creates individual rights, which, by virtue of Article I of the Optional Protocol, *may be invoked in [that court] by the national State* of the detained person.' [emphasis added]. The [court] also held that if the United States should fail in its obligation under Article 36, then the United

States should allow review of the conviction and sentence by taking into account the violation of the rights set forth in the Vienna Convention. However, the [court] recognized that the 'obligation can be carried out in various ways' and that '[t]he choice of means must be left to the United States' " [citations to *LaGrand* omitted]).

Finally, "[t]he other very powerful reason for reaching this conclusion is that the State Department in substance supports it. As we have held in other cases, the State Department's view is entitled to substantial weight in treaty interpretation." *United States* v. *Li, supra* at 67.

The third, and most popular, approach to this issue is the one declining to provide a definitive answer to the question and leapfrogging to the second consideration of the remedy, or lack thereof, for a violation. "[F]ederal courts whenever possible have sidestepped the question of whether the treaty creates individual rights — typically by concluding that remedies such as suppression of evidence or dismissal of an indictment are not available even if the treaty creates individual rights." *United States* v. *Emuegbunam, supra* at 391, and cases cited. Indeed, as stated by the Fifth Circuit Court of Appeals, "[a]ll of our sister circuits have held that suppression of evidence is not a remedy for an Article 36 violation." *United States* v. *Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir.), cert. denied, 533 U.S. 962 (2001), and cases cited. See *United States* v. *Chaparro-Alcantara*, 226 F.3d 616, 622 (7th Cir.), cert. denied, 531 U.S. 1026 (2000) ("In concluding that suppression is not an available remedy under Article 36 of the Vienna Convention, we note our agreement with our colleagues in the Ninth Circuit in [*United States* v.] *Lombera-Camorlinga*, [206 F.3d 882 (9th Cir.), cert. denied, 531 U.S. 991 (2000)], the First Circuit in *Li*, and the Eleventh Circuit in *United States* v. *Cordoba-Mosquera*, 212 F.3d 1194, 1195-96 (11th Cir. 2000) [cert. denied sub nom. *Zuniga* v. *United States*, 531 U.S. 1131 (2001)]"). We think this position preferable and adhere to it.

Suppression is not warranted for a variety of reasons. First, no express language in the treaty contemplates suppression. "Absent [such] an express provision in the treaty, the exclusionary rule is an inappropriate sanction." *United States* v. *Jimenez-*

*Nava, supra* at 199 (citations omitted). "We cannot attach the judicially created remedy of suppression to the Vienna Convention without some explicit support from the treaty itself." *United States* v. *Chaparro-Alcantara, supra* at 622. "We also note that to impose judicially such a drastic remedy, not imposed by any other signatory to this convention, would promote disharmony in the interpretation of an international agreement. See Restatement of Foreign Relations Law, § 325 [comment] d (1987) ('Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between international legal systems')." *Ibid.* See *United States* v. *Lombera-Camorlinga*, 206 F.3d at 888 ("The State Department also points out that no other signatories to the Vienna Convention have permitted suppression under similar circumstances, and that two [Italy and Australia] have specifically rejected it. . . . By refusing to adopt an exclusionary rule, we thus promote harmony in the interpretation of an international agreement").

Similarly, it is unnecessary for this court to decide whether Article 36 confers individual rights, as it is not essential for resolving the underlying dispute. Even if the treaty does confer such rights, and we are neither stating nor intimating that it does, the suppression of evidence, as indicated above, is not an appropriate remedy for a violation.

Lastly, "even if suppression were an appropriate remedy for a violation of the Vienna Convention, it would not be appropriate in this case because [the defendant] has not demonstrated he was prejudiced by a violation of the treaty. . . . [The defendant] understood his constitutional rights, and was generally familiar with this country's criminal processes. Moreover, in this case, the [lower] court made a factual finding that [the defendant's] assertion that he would have contacted the consulate had he been aware of his Vienna Convention rights lacked credibility. We defer to a [trial] court's credibility determinations when reviewing a . . . court's findings of fact under a clearly erroneous standard, and nothing in the remainder of the record leaves us with a conviction that a mistake has been made." *United*

*States* v. *Minjares-Alvarez,* 264 F.3d 980, 987-988 (10th Cir. 2001) (citations omitted).[11]

Likewise, in the case at bar, Diemer did not demonstrate prejudice. He was intelligent, literate, and spoke English fluently. He was read his Miranda rights on three separate occasions. The motion judge found that, even if he had been notified of his rights under Article 36, Diemer was "almost irrepressibly eager to discuss with authorities his knowledge of the circumstances surrounding Ms. Magnarelli's death."[12] As in *United States* v. *Minjares-Alvarez, supra,* "[w]e defer to a [trial] court's credibility determination when reviewing a [trial] court's findings of fact under a clearly erroneous standard," and are satisfied that nothing in the record indicates a mistake has been made.[13]

*Remaining issues.* The remaining issues can be dealt with in summary fashion.

*Redirect testimony.* During trial, Hudson, a witness for the Commonwealth, testified that Diemer had not only been present when Saffores admitted the killing, but added his own involvement in assisting Saffores in covering up the crime. Hudson was subjected to a forceful cross-examination where the defense focused on discrepancies between Hudson's trial testimony, grand jury testimony, and statements to the police, insinuating fabrication. On redirect, the Commonwealth established that Hudson's August statement to the police was consistent with his trial testimony. To this, the defense objected.

---

[11]In harmony with the other circuits, the court also held that "we need not decide whether the Vienna Convention creates individually enforceable rights." *United States* v. *Minjares-Alvarez,* 264 F.3d 980, 986 (10th Cir. 2001).

[12]The routine practice, as the motion judge found, of the German consulate, upon learning that a German national was under arrest and wished to speak with them, was to advise the person of his rights in German and to assist the person in obtaining an attorney. Further, Diemer would have been advised not to speak with the police until first speaking with an attorney. There was no evidence, however, that Diemer would have availed himself of his right to speak with the consulate. Further, as the judge found, given Diemer's loquaciousness, it was doubtful he would have done anything differently, even if he had been contacted by the German consulate.

[13]Notwithstanding our decision, we are disheartened to learn that, on this occasion at least, Massachusetts has not acted in conformity with Article 36. It is reassuring, thus, to read in the amicus brief filed by the Attorney General that steps are being undertaken to address this issue in the future.

The admission of Hudson's redirect testimony regarding his statement to the police as a prior consistent statement was proper. "[A] witness's prior statement is admissible where a claim is made that the witness's in-court statement is of recent contrivance or is the product of inducement or bias." *Commonwealth* v. *Fryar*, 425 Mass. 237, 252, cert. denied, 522 U.S. 1033 (1997). "The trial judge has a range of discretion in determining whether a suggestion of recent contrivance exists in the circumstances." *Commonwealth* v. *Zukoski*, 370 Mass. 23, 27 (1976).

The trial judge acted within his discretion in admitting the testimony. In so ruling, the judge also was within his discretion in implicitly finding that Hudson did not have a motive to fabricate his August statement. While defense counsel, on cross-examination, did elicit that the defendant was somewhat reluctant to deal with law enforcement authorities when he first spoke with police in June of 1998, that is of no moment.[14] It is whether there existed a motive to fabricate in August that controls the issue here. Our reading of the transcript reveals no such motive.

*Prior bad act.* The Commonwealth introduced evidence that, in March, 1998, Diemer was present and ripped a telephone from the wall of the home Saffores and Magnarelli shared following an altercation between Saffores and Magnarelli.

The law governing prior bad acts is well known and need not be discussed at length. Briefly, a prior bad act is admissible, not to show bad character or propensity to commit a crime, but for a limited purpose, e.g., to demonstrate a common scheme, pattern of operation, absence of mistake or accident, identity, intent or motive. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986).

The evidence tended to demonstrate the relationship between Diemer and Saffores, and was probative of Diemer's intent and motive. "The admissibility of prior bad act evidence lies in

---

[14]The tenor of the transcript indicates that rather than being intimidated by police, Hudson's reluctance stemmed in large part from the fact that Saffores had admitted to him that he had murdered Magnarelli, yet he, Hudson, had told no one, and he did not want his parents to know of his silence regarding the murder.

large measure in the trial judge's discretion, and we accept it absent palpable error." *Commonwealth* v. *Adams*, 434 Mass. 805, 821 (2001). The evidence was admissible to demonstrate the defendant's awareness of the volatile relationship between Saffores and Magnarelli, as well as the defendant's kinship with Saffores, and his support of Saffores's hostility toward Magnarelli. There was no error.

*Jury instruction.* The failure of the trial judge to give a requested jury instruction[15] was not reversible error.[16] A judge need not use particular words for instructions and need not give an instruction on every subsidiary fact and possible inference. See *Commonwealth* v. *Chasson*, 383 Mass. 183, 188 (1981). "As long as a judge gives adequate and clear instructions on the applicable law, the phraseology, method and extent of the charge are matters within his discretion." *Commonwealth* v. *Roberts*, 378 Mass. 116, 130 (1979). The judge's instructions were sufficient.

*Judgment affirmed.*

---

[15]Diemer requested instructions that "in the Commonwealth of Massachusetts it is not a crime for a person having knowledge of a crime, of whatever nature, having been committed to fail to report said knowledge to the police" and that "under the laws of the Commonwealth, ordinary persons have no duty to report any particulars of a crime of which they are aware has been committed."

[16]The judge instructed the jury, in part, that "[t]he third element which must be proved beyond a reasonable doubt is that the defendant, Sven Diemer, thereafter intentionally harbored, concealed, maintained or assisted . . . Heath Saffores with the intent that Heath Saffores should avoid or escape detention, arrest, trial or punishment for the crime of the murder of Kim Magnarelli."