IN THE COURT OF CRIMINAL
APPEALS

                                   OF TEXAS              

 

                                                                              

                                                                NO.
AP-75,207



 

 

                              EX
PARTE JOS_ ERNESTO MEDELL_N, Applicant

 

                                                                              



                          ON
APPLICATION FOR A WRIT OF HABEAS CORPUS 

CAUSE NO. 675430 FROM THE 339TH DISTRICT COURT 

OF HARRIS COUNTY



 

Keasler, J., delivered the opinion of the Court
with respect to Parts I, II, III.A., III.C., and IV, in which Keller, P.J.,
Meyers, Price, Johnson, Hervey, Holcomb, and Cochran, JJ.,
joined, and an opinion with respect to Part III.B., in which Meyers, Price,
and Hervey, JJ., joined.  Womack, J., concurs in the
result.  Keller, P.J., filed a
concurring opinion.  Price, J., filed
a concurring opinion.  Hervey, J., filed
a concurring opinion.  Cochran, J., filed
a concurring opinion in which Johnson, and Holcomb, JJ., joined. 

 

                                                                  O
P I N I O N

 








José Ernesto Medellín filed this
subsequent application, alleging that the International Court of Justice Avena
decision and the President=s memorandum directing state courts to give effect to
Avena, require this Court to reconsider his Article 36 Vienna Convention
claim because they (1) constitute binding federal law that preempt Section 5,
Article 11.071 and (2) were previously unavailable factual and legal bases
under Section 5(a)(1).  We hold that Avena
and the President=s memorandum do not preempt Section 5 and do not qualify as
previously unavailable factual or legal bases.

I.    
PROCEDURAL HISTORY OF MEDELL_N=S CASE

Medellín, a Mexican national, was
convicted of capital murder and sentenced to death for his participation in the
gang rape and murder of two teenage girls in Houston.  We affirmed his conviction and sentence on
direct appeal.[1]








Medellín filed an initial application
for a writ of habeas corpus, claiming for the first time, among other things,
that his rights under Article 36 of the Vienna Convention had been violated
because he had not been advised of his right to contact the Mexican consular
official after he was arrested.[2]  The district court found that Medellín failed
to object to the violation of his Vienna Convention rights at trial and, as a
result, concluded that his claim was procedurally barred from review.  The court also found, in the alternative,
that Medellín, as a private individual, did not have standing to bring a claim
under the Vienna Convention because it is a treaty among nations and therefore
does not confer enforceable rights on individuals; only signatory nations have
standing to raise a claim under the treaty. 
Offering an additional alternative, the court determined that Medellín
failed to show harm because he received effective legal representation and his
constitutional rights had been safeguarded. 
Finally, the court concluded that Medellín did not prove that his rights
under the Fifth, Sixth, and Fourteenth Amendments had been violated and that he
failed to show that any non-notification affected the validity of his
conviction and sentence.  We adopted the
trial court=s findings of fact and conclusions of
law with written order and denied relief.[3]








Medellín then presented his Vienna
Convention claim in a federal petition for a writ of habeas corpus.  The district court denied relief,[4]
and Medellín filed for a certificate of appealability.  While his application was pending, the
International Court of Justice (ICJ) issued its decision in Avena.[5]  In that case, Mexico claimed that the United
States had violated the Vienna Convention by failing to timely advise more than
fifty Mexican nationals awaiting execution in United States prisons, including
Medellín, of their right to talk to a consular official after they had been
detained.[6]  The ICJ ruled in favor of Mexico, holding
that the Vienna Convention does confer individual rights and that the United
States violated the Convention.[7]  To remedy the violation, the ICJ ordered the
United States to provide review and reconsideration of the convictions and
sentences[8]
at issue to determine whether the violation Acaused actual prejudice to the
defendant in the process of administration of criminal justice.@[9] 
The ICJ specifically stated that review is required regardless of
procedural default rules that would otherwise bar review.[10]








The federal district court denied
Medellín=s application for a certificate of
appealability, and Medellín appealed to the United States Court of Appeals for
the Fifth Circuit, which also denied his application.[11]  The Fifth Circuit noted the ICJ decision in Avena,
but determined that it was bound by the Supreme Court=s decision in Breard v. Greene,
which held that claims based on a violation of the Vienna Convention are
subject to procedural default rules.[12]  Continuing, the court found that even if
Medellín=s Vienna Convention claim was not
procedurally defaulted, its previous holding in United States v.
Jimenez-NavaCthat the Vienna Convention does not create individually
enforceable rightsCwould require it to deny Medellín=s application for a certificate of
appealability.[13]             Medellín
petitioned for certiorari to the Supreme Court of the United States, which
granted review.[14]  Before oral argument, the President issued a
memorandum directing state courts to give effect to the Avena decision
under the principles of comity.[15]  Then, while his case was pending before the
Supreme Court, Medellín filed an application for a writ of habeas corpus in
this Court, requesting that we give full effect to the Avena decision
and to the President=s memorandum.[16]  The Supreme Court subsequently dismissed
Medellín=s case as improvidently granted,
stating that there is a possibility that ATexas courts will provide Medellin
with the review he seeks pursuant to the Avena judgment and the
President=s memorandum . . . .@[17] 

Based on the Supreme Court=s dismissal, we determined that
Medellín=s subsequent application is ripe for
consideration.[18]  We therefore filed and set this case for
submission. 








Under Article 11.071, Section 5(a) of
the Code of Criminal Procedure, we may not consider the merits of any claims
raised on a subsequent application for a writ of habeas corpus or grant relief
unless the applicant provides sufficient specific facts demonstrating that: 

!   Athe current claims and issues have not been and could
not have been presented previously in a timely initial application or in a
previously considered application . . . because the factual or legal basis for
the claim was unavailable on the date the applicant filed the previous
application@;[19]


 

!   Aby a preponderance of the evidence, but for a
violation of the United States Constitution no rational juror could have found
the applicant guilty beyond a reasonable doubt@;[20]
or 

 

!   Aby clear and convincing evidence, but for a violation
of the United States Constitution no rational juror would have answered in the
State=s favor one or more of the special issues . . . .@[21]

 








We ordered Medellín and the State to
brief the following issue: whether Medellín Ameets the requirements for
consideration of a subsequent application for writ of habeas corpus under the
provisions of Article 11.071, section 5, of the Texas Code of Criminal
Procedure.@[22] 
We also invited the Attorney General of the United States to Apresent the views of the United
States.@[23] 
On September 14, 2005, we heard oral argument from the parties and the
Solicitor General, who argued on behalf of the Attorney General of the United
States.  Medellín=s claims raise many remarkable issues
of first impression for this Court to resolve. 
Before we provide some necessary background information, we begin with a
brief overview of the arguments advanced by the parties and the United States
as amicus curiae.

Medellín argues that the Avena
decision and the President=s memorandum are binding federal law that preempt Section 5
under the Supremacy Clause of the United States Constitution.[24]  Alternatively, contending that he meets the
requirements of Section 5(a)(1), Medellín claims that the Avena decision
and the President=s memorandum are previously unavailable factual and legal
bases because neither was available when he filed his first application.[25]  Countering Medellín=s arguments, the State contends that
the Avena decision and the President=s memorandum do not meet the
requirements of Section 5 and do not override it.[26]  Finally, the United States as amicus
curiae asserts that, although Avena is not enforceable in United
States courts, Medellín is entitled to review and reconsideration of the merits
of his Vienna Convention claim Ato the extent that his claim relies on the President=s determination that >review and reconsideration= . . . by Texas courts is necessary
for compliance with the United States= international obligations.@[27] 
The United States also avers that ASection 5 would contravene the
President=s implementation of treaty
obligations, and federal law would preempt its operation in the circumstances
of this case.@[28] 








II. 
CONTEXTUAL BACKGROUND

A.        Treaties

Treaties are compacts between
sovereign nations.[29]  In the international arena,  compliance with a treaty depends upon Athe interest and the honor@ of the treaty=s member nations.[30]  When a member nation violates a treaty,
another member nation cannot obtain redress from the judicial body of the
violating nation but may seek enforcement through Ainternational
negotiations and reclamations.@[31]








Treaties, entered into by the
President of the United States with the consent of a super-majority of the
United States Senate,[32]
are incorporated into the domestic law of our country pursuant to the Supremacy
Clause of the United States Constitution, which commands: Aall Treaties made, or which shall be
made, under the Authority of the United States, shall be the supreme Law of the
Land; and the Judges in every State shall be bound thereby, any Thing in the
Constitution or Laws of any State to the Contrary notwithstanding.@[33] 
Treaties are Aplaced on the same footing@ as legislation enacted by the United
States Congress, and while neither is superior to the other,[34]
both are subject to the United States Constitution.[35]  In describing the relationship between
treaties and acts of Congress, the Supreme Court explained the difference
between treaties that do not contain self-executing provisions and those that
do:








When the stipulations are not self-executing they can
only be enforced pursuant to legislation to carry them into effect, and such
legislation is as much subject to modification and repeal by Congress as
legislation upon any other subject.  If
the treaty contains stipulations which are self-executing, that is, require no
legislation to make them operative, to that extent they have the force and
effect of a legislative enactment. Congress may modify such provisions, so far
as they bind the United States, or supersede them altogether.[36]


 

When a self-executing treaty and an
act of Congress concern the same subject matter, courts should give effect to
both unless the language of one would be violated.[37]  But when Athe two are inconsistent, the one
last in date will control the other.@[38]

Addressing the relationship between
state law and treaties, the Supreme Court has stated: A[T]reaties with foreign nations will
be carefully construed so as not to derogate from the authority and
jurisdiction of the States of this nation unless clearly necessary to
effectuate the national policy.@[39] 
Accordingly, Astate law must yield when it is inconsistent with, or impairs
the policy or provisions of, a treaty or of an international compact or
agreement.@[40]













The Supreme Court
has recognized that a treaty may contain certain provisions that grant
judicially enforceable rights to a foreign national residing in another
country.[41]  In such cases, under the Supremacy Clause,
the provisions of the treaty are placed in the Asame category as
other laws of Congress@ and therefore, are Asubject to such
acts as Congress may pass for its enforcement, modification, or repeal.@[42] 
When a treaty confers rights that are judicially enforceable, a court
will look Ato the treaty for a rule of decision
for the case before it as it would to a statute.@[43] 
However, as we recently noted, there is a presumption that A>international agreements, even those
directly benefitting private persons, generally do not create private rights or
provide for a private cause of action in domestic courts.=@[44] 
Numerous federal circuit courts of appeals have also acknowledged this
presumption, finding that treaty rights belong to the member nations only,[45]
and therefore, may be enforced only through international political and
diplomatic channels.

B.        The
United Nations Charter and the Statute of the International Court of Justice








The United Nations was formed when
its Charter, drafted in San Francisco at the United Nations Conference on
International Organization, was ratified by the United States, the Republic of China,
France, the Union of Soviet Socialist Republics, Great Britain, Northern Ireland, and a majority of
other signatory nations.[46]  With respect to the United States, the
Charter entered into force on October 24, 1945. 
Article 92 establishes the ICJ as Athe principal judicial organ of the
United Nations.@[47] 
The ICJ operates Ain accordance with the annexed Statute [of the ICJ] . . . .@[48] 
Under Article 93, AAll Members of the United Nations are ipso facto
parties to the Statute of the International Court of Justice.@[49] 
The Statute of the ICJ establishes, among other things, the court=s organization, competence (which
includes its jurisdiction), and procedures.[50]  Article 34 of the Statute provides that A[o]nly states may be parties in cases
before the [ICJ]@ and, under Article 36(1), the court has jurisdiction over Acases which the parties refer to it
and all matters specifically provided for . . . in treaties and conventions in
force.@[51] 
Under Article 59, an ICJ decision binds only the parties to that
particular case.[52]  Article 94 of the United Nations Charter
states that each member Aundertakes to comply with the decision of the International
Court of Justice in any case to which it is a party.@[53] 
If a party fails to comply with the ICJ=s decision, Athe other party may have recourse to
the Security Council, which may, if it deems necessary, make recommendations or
decide upon measures to be taken to give effect to the judgment.@[54]

C.      The
Vienna Convention on Consular Relations and the Optional Protocol Concerning
the Compulsory Settlement of Disputes

 








The Vienna Convention on Consular
Relations was adopted by the United Nations Conference on Diplomatic
Intercourse and Immunities on April 24, 1963.[55]  The Vienna Convention is a seventy-nine
article multilateral treaty that Apromotes the effective delivery of
consular services in foreign countries, including access to consular assistance
when a citizen of one country is arrested, committed to prison or custody
pending trial, or detained in any other manner in another country.@[56] 
Mexico, one of the first countries to deposit its ratification with the
United Nations Secretary-General after the Convention opened for signatures on
April 18, 1961, became bound by Convention on March 19, 1967.[57]  With the advice and consent of the Senate,
the President ratified the Convention, which became binding on the United
States on December 24, 1969.[58]

Article 36 Aensure[s] that no signatory nation
denies consular access and assistance to another country=s citizens traveling or residing in a
foreign country . . . .@[59] 
Article 36 reads as follows:

1.   With a view
to facilitating the exercise of consular functions relating to nationals of the
sending State:

 

(a) consular
officers shall be free to communicate with nationals of the sending State and
to have access to them. Nationals of the sending State shall have the same
freedom with respect to communication with and access to consular officers of
the sending State;

 








(b) if he so requests, the competent authorities of
the receiving State shall, without delay, inform the consular post of the
sending State if, within its consular district, a national of that State is
arrested or committed to prison or to custody pending trial or is detained in
any other manner. Any communication addressed to the consular post by the
person arrested, in prison, custody or detention shall also be forwarded by the
said authorities without delay. The said authorities shall inform the person
concerned without delay of his rights under this sub-paragraph;

 

(c) consular
officers shall have the right to visit a national of the sending State who is
in prison, custody or detention, to converse and correspond with him and to
arrange for his legal representation. They shall also have the right to visit
any national of the sending State who is in prison, custody or detention in
their district in pursuance of a judgment. Nevertheless, consular officers
shall refrain from taking action on behalf of a national who is in prison,
custody or detention if he expressly opposes such action.

 

2.   The
rights referred to in paragraph 1 of this Article shall be exercised in
conformity with the laws and regulations of the receiving State, subject to the
proviso, however, that the said laws and regulations must enable full effect to
be given to the purposes for which the rights accorded under this Article are
intended.[60]








In addition to becoming signatories
to the Vienna Convention, Mexico and the United States became parties to the
Optional Protocol Concerning the Compulsory Settlement of Disputes.  Article I of the Optional Protocol states: ADisputes arising out of the
interpretation or application of the Convention shall lie within the compulsory
jurisdiction of the International Court of Justice and may accordingly be
brought before the Court by an application made by any party to the dispute
being a Party to the present Protocol.@[61]  Although the
United States recently withdrew from the Optional Protocol, the United States
has agreed to Adischarge its inter-national obligations under the
decision . . . by having State courts give effect to the [Avena] decision
. . . .@[62] 

 

D.        International
Court of Justice Rulings on Article 36 of the Vienna Convention Involving the
United States 

 








The ICJ has encountered a series of
cases filed against the United States by other nations alleging violations of
Article 36 of the Vienna Convention. 
Paraguay filed the first case on behalf of its citizen, Angel Francisco
Breard.[63]  The ICJ issued an order, at Paraguay=s request, requesting the United
States to stay Breard=s execution until it could render a decision.[64]  Based on that order, Breard filed an original
petition for a writ of habeas corpus and an application to stay his execution
in the Supreme Court of the United States.[65]  The Supreme Court found that Breard=s claim was procedurally defaulted
and denied his petition and application; Breard was later executed.[66]  Paraguay then requested that the ICJ
discontinue the proceedings with prejudice; thus, the ICJ did not issue a
decision regarding Breard.[67]








Subsequently, two more suits were
filed, Federal Republic of Germany v. United States of America (LaGrand)[68]
and Mexico v. United States of America (Avena).[69]  In LaGrand, Germany initiated
proceedings in the ICJ on behalf of two of its citizens, brothers Karl and
Walter LaGrand, who had been convicted of murder and sentenced to death in
Arizona.[70]
Germany alleged that the United States violated Article 36 of the Vienna
Convention by failing to inform the LaGrands of their right to contact a German
consular official.[71]  Although both the LaGrands were executed
before the ICJ issued its judgment, the ICJ still found, among other things,
that: (1) Article 36 of the Vienna Convention confers individual rights on
detained foreign nationals; (2) the United States failed to comply with Article
36; and (3) as applied to the LaGrands, the procedural default rules of the
United States prevented the rights intended under Article 36 from being given
full effect.[72]  The court further stated that the United
States, Aby means of its own choosing, shall
allow the review and reconsideration of the conviction and sentence by taking
account of the violation of the rights set forth in that Convention.@[73]

Almost three years after LaGrand,
the ICJ handed down its decision in Avena.  With regard to Medellín and fifty other
Mexican nationals, the ICJ concluded that the United States breached its
obligations under Article 36, paragraph 1(b) by failing to inform them, after
their arrests and without delay, of their right to contact the Mexican consular
post.[74]  And in forty-nine cases, including Medellín=s case, the court found that the
United States violated Article 36, paragraphs 1(a) through (c) by failing to:
(1) notify the consular post of their detention; (2) enable consular officials
to communicate with and have access to them; and (3) enable consular officials
to visit with them.[75]  The court also found that in Medellín=s case, in addition to thirty-three
others, the United States violated Article 36, paragraph (c) by preventing
consular officials from being able to timely arrange for their citizens= legal representation.[76]








After addressing the United States= and Mexico=s arguments concerning the
appropriate remedy for the Article 36 violations, the court concluded Athat the >review and reconsideration= prescribed by it in the LaGrand
case should be effective.@[77] 
Directing the United States to provide review and reconsideration of the
convictions and sentences of the Mexican nationals whose individual rights
under the Vienna Convention had been violated,[78]
the ICJ stated:

The rights guaranteed under the Vienna Convention are
treaty rights which the United States has undertaken to comply with in relation
to the individual concerned, irrespective of the due process rights under
United States constitutional law.  In
this regard, the Court would point out that what is crucial in the review and
reconsideration process is the existence of a procedure which guarantees that
full weight is given to the violation of the rights set forth in the Vienna
Convention, whatever may be the actual outcome of such review and
reconsideration.[79]


 

E.        The
Presidential Memorandum 

After the United States Supreme Court
granted certiorari in this case, the President weighed in on the controversy
surrounding Avena by issuing a memorandum to the United States Attorney
General, which states, in pertinent part, as follows:

I have determined, pursuant to the authority vested in
me as President by the Constitution and the laws of the United States of
America, that the United States will discharge its inter-national obligations
under the decision of the International Court of Justice in . . . [Avena],
by having State courts give effect to the decision in accordance with general
principles of comity in cases filed by the 51 Mexican nationals addressed in
that decision.[80]

 

III.  ANALYSIS

 

A.        Avena
and The Supremacy Clause








Medellín claims that the ICJ decision
in Avena is binding federal law that preempts Section 5 of the Texas
Code of Criminal Procedure.  The State
and the United States as amicus curiae disagree.      

As an initial matter, while we
recognize the competing arguments before us concerning whether Article 36
confers privately enforceable rights, a resolution to that issue is not
required for our determination of whether Avena is enforceable in this
Court. Our decision is controlled by the Supreme Court=s recent opinion in Sanchez-Llamas
v. Oregon, and accordingly, we hold that Avena is not binding
federal law and therefore does not preempt Section 5.








While Medellín=s case was pending before us, the
Supreme Court granted certiorari in Sanchez-Llamas v. Oregon[81]
and Bustillo v. Johnson,[82]
consolidating the two cases to consider: A(1) whether Article 36 of the Vienna
Convention grants rights that may be invoked by individuals in a judicial
proceeding; (2) whether suppression of evidence is a proper remedy for a
violation of Article 36; and (3) whether an Article 36 claim may be deemed
forfeited under state procedural rules because a defendant failed to raise the
claim at trial.@[83]  The Court issued its decision in these cases
during the last week of its 2005 term.[84]  Although the Court found it unnecessary to
decide whether Article 36 grants privately enforceable rights,[85]
the Court held that the exclusionary rule is not a remedy for violations of
Article 36[86]
and reaffirmed its holding in Breard, stating AWe . . . conclude,
as we did in Breard, that claims under Article 36 of the Vienna
Convention may be subjected to the same procedural default rules that apply
generally to other federal-law claims.@[87]








When addressing
petitioner Bustillo=s argument that the Court should revisit
its decision in Breard in light of the ICJ=s decisions in LaGrand
and Avena, the Court concluded that ICJ decisions are entitled only to A>respectful consideration.=@[88] 
In support of this determination, the Court cited its constitutionally
mandated position as the absolute authority in defining a treaty=s meaning as federal law[89]
and stated that A[i]t is against this background that the United States
ratified, and the Senate gave its advice and consent to, the various agreements
that govern referral of Vienna Convention disputes to the ICJ.@[90] 
Looking at those agreements, the Court determined that A[n]othing in the structure or purpose
of the ICJ suggests that its interpretations were intended to be conclusive on
our courts.@[91] 
The Court noted that under Article 59 of the Statute of the ICJ, an ICJ
decision binds only the parties to that case and, as a result, not even the ICJ
is bound by its prior decisions.[92]  Reviewing Articles 59 and 34 of the Statute,
the Court also considered that the Aprinciple purpose [of the ICJ] is to
arbitrate particular disputes between national governments.@[93] 
Finally, the Court pointed out that Article 94(2) of the United Nations
Charter Acontemplates quintessentially international
remedies@ because an aggrieved nation may seek
recourse from the Security Council when another nation fails to comply with an
ICJ decision.[94]  According A>great weight=@[95] to the meaning placed on the Vienna
Convention by the Executive Branch, the Court then noted that even though the
President has ordered state courts to give effect to Avena, the United
States has taken the position that ICJ decisions are not binding on United
States courts.[96]  Finally, the Court expressed doubt about
giving Adecisive weight@ to LaGrand and Avena
when the United States has since withdrawn from the Optional Protocol.[97]









Granting A>respectful consideration=@[98] to the LaGrand and Avena
decisions, the Court held that Athe ICJ=s interpretation cannot overcome the plain import of Article
36.@[99] 
Turning to its prior decision in Breard, the Court stated: Athe procedural rules of domestic law
generally govern the implementation of an international treaty.@[100] 
The plain language of Article 36(2)Cthat Article 36(1) rights Ashall be exercised in conformity with
the laws and regulations of the receiving State@ and that those Alaws and regulations must enable full
effect to be given@ to the intended purpose of the rights in Article 36(1)[101]Cmeans that rules of procedural
default apply to Vienna Convention claims just as they apply to claims raised
under the United States Constitution.[102]
The Court recognized the important role that procedural default rules play in
our adversarial justice system[103]
and disagreed with the ICJ=s interpretation of the Afull effect@ language in Article 36(2).[104]  Noting the problems associated with the ICJ
interpretation of the Afull effect@ language, the Court stated: 








Article 36 claims could trump not only procedural
default rules, but any number of other rules requiring parties to present their
legal claims at the appropriate time for adjudication.  If the State=s
failure to inform the defendant of his Article 36 rights generally excuses the
defendant's failure to comply with relevant procedural rules, then presumably
rules such as statutes of limitations and prohibitions against filing
successive habeas petitions must also yield in the face of Article 36 claims.[105]

 

The Court then stated that the ICJ
interpretation Asweeps too broadly@[106] because Article 36(2) also requires
that Article 36(1) rights A>be exercised in conformity with the
laws and regulations of the receiving State.=@[107]

In this case, we are bound by the
Supreme Court=s determination that ICJ decisions
are not binding on United States courts. 
As a result, Medellín, even as one of the named individuals in the
decision, cannot show that Avena requires us to set aside Section 5 and
review and reconsider his Vienna Convention claim.

B.        The
Presidential Memorandum and the Supremacy Clause

Aligned on the effect of the
President=s memorandum, both Medellín and the
United States as amicus curiae contend that the President=s February 28, 2005, memorandum
preempts Section 5 and, as a result, requires us to review and reconsider
Medellín=s conviction and sentence as
prescribed by Avena.  In
opposition, the State challenges, among other things, the effect of the
memorandum=s substantive language.     








The United States= and Medellín=s arguments presume that the
President=s memorandum to the United States
Attorney General amounts to an executive order.[108]  The State disputes this, arguing that the
memorandum does not contain any mandatory language: AWhile the President=s memo rightly shows the intent and
determination of the United States to enforce the consular provisions of the
Vienna Convention, the memo does not order . . . state courts to disregard
controlling precedents, state statutory provisions, or state procedural default
rules.@[109] 
The State=s position is not without merit, but because we conclude that
Medellín has not shown that the President=s memorandum entitles him to review
and reconsideration, we will assume, without deciding, that the memorandum
constitutes an executive order.[110]













AGovernmental power over internal
affairs is distributed between the national government and the several states.@[111] 
Describing the federal government=s powers over internal affairs, the
Supreme Court has acknowledged: AThe broad statement that the federal
government can exercise no powers except those specifically enumerated in the
Constitution, and such implied powers as are necessary and proper to carry into
effect the enumerated powers, is categorically true only in respect of our
internal affairs.@[112] 
With regard to external affairs, the federal government possesses
exclusive power; it is Avested with all the powers of government necessary to
maintain an effective control of international relations.@[113] 
When acting in external affairs, the President has Aplenary and exclusive power . . . as
the sole organ of the federal government in the field of international
relations.@[114] 
And while the President=s power Amust be exercised in subordination to the applicable
provisions of the Constitution,@ such power is not necessarily dependent on specific
congressional authorization.[115]  The President, for example, can enter into
executive agreements with foreign nations without the advice and consent of the
Senate.[116]  Valid agreements are accorded the same status
as treaties[117]
and, consequently, may preempt state law if they A>impair the effective exercise of the
Nation=s foreign policy.=@[118] 
Executive orders issued by the President must be authorized by an act of
Congress or by the Constitution.[119]

Justice Jackson, in his concurring
opinion in Youngstown Sheet & Tube Company v. Sawyer, sought to
define the scope of the President=s power.[120]  Recognizing that he was offering Aa somewhat over-simplified grouping@ because A[p]residential powers are not fixed
but fluctuate, depending upon their disjunction or conjunction with those of
Congress,@[121] Justice Jackson related the
following:








!   The
President=s Aauthority is at its maximum@ A[w]hen the President acts pursuant to
an express or implied authorization of Congress.@[122] 
In such circumstances, the President=s power Aincludes all that he possesses in his
own right plus all that Congress can delegate.@[123]

!   The President=s power is in Aa zone
of twilight@ A[w]hen the President acts in absence of either a
congressional grant or denial of authority.@[124]  When acting in
Aa zone of twilight,@ the
President is dependent on Ahis own independent powers.@[125]  And ACongress may have concurrent authority.@[126]  The Adistribution@ of
authority between the President and Congress may be Auncertain.@[127]  A[C]ongressional inertia, indifference or quiescence
may sometimes, at least as a practical matter, enable, if not invite, measures
on independent presidential responsibility.@[128]

 

!   The
President=s Apower is at its lowest ebb@ A[w]hen the President takes measures
incompatible with the expressed or implied will of Congress.@[129] 
When acting at the Alowest ebb,@ the President Acan rely only upon his own
constitutional powers minus any constitutional powers of Congress over the
matter.@[130] 
Such power, Justice Jackson advised, Amust be scrutinized with caution, for
what is at stake is the equilibrium established by our constitutional system.@[131]








The President=s memorandum cites his authority
under the Constitution and laws of the United States.[132]  With this in mind, we must decide whether the
President has exceeded his power by directing us to give effect to the Avena
decision under the principles of comity. 
The President=s directive, which is dependent on his power to act in both
foreign and domestic affairs, is unprecedented. 
What Justice Jackson proclaimed in his concurrence in Youngstown
Sheet & Tube Company fifty-four years agoCthat the judiciary Amay be surprised at the poverty of
really useful and unambiguous authority applicable to concrete problems of
executive power as they actually present themselves@[133]Cresonates with us today.








We hold that the President has
exceeded his constitutional authority by intruding into the independent powers
of the judiciary.  By stating Athat the United States will discharge
its inter-national obligations under the decision of the International Court of
Justice in . . . [Avena], by having State courts give effect to the
decision . . . [,]@[134] the President=s determination is effectively
analogous to that decision.  In Sanchez-Llamas,
the Supreme Court made clear that its judicial Apower includes the duty >to say what the law is.=@[135] 
And that power, according to the Court, includes the authority to
determine the meaning of a treaty as a Amatter of federal law.@[136] 
The clear import of this is that the President cannot dictate to the
judiciary what law to apply or how to interpret the applicable law.  

Medellín and the United States argue
that the President=s authority is at its maximum.  In doing so, both rely on the President=s inherent foreign affairs power to
enter into executive agreements to settle claims with foreign nations as
recognized by the Supreme Court in United States v. Belmont,[137]
United States v. Pink,[138]
Dames & Moore v. Regan,[139]
and American Insurance Association v. Garamendi.[140]  We therefore begin by reviewing these cases.








In Belmont, a Russian
corporation, Petrograd Metal Works, deposited funds with a private New York
City banker, Belmont.[141]  The Soviet Government Adissolved, terminated and liquidated
[Petrograd Metal Works along with other corporations], and nationalized and
appropriated all of its property and assets of every kind and wherever
situated, including the deposit account with Belmont.@[142] 
The Soviet Government later assigned all amounts owed to it from United
States nationals to the United States.[143]

The [Litvinov] [A]ssignment was
effected by an exchange of diplomatic correspondence between the Soviet
Government and the [Executive Branch of the] United States. The purpose was to
bring about a final settlement of the claims and counterclaims between the
Soviet Government and the United States; and it was agreed that the Soviet
Government would take no steps to enforce claims against American nationals[.][144]

The assignment was
accompanied by the recognition of the Soviet Government by the President of the
United States and the establishment of diplomatic relations between the two.[145]

The Supreme Court
disagreed with the lower court=s holding that
giving effect to the Soviet nationalization decree would result in Aan act of
confiscation@ and would be Acontrary to the
controlling public policy of the State of New York.@[146]  The Court found that the Litvinov Assignment
was an international compact between the Soviet and United States governments
and that the rule of a treaty=s supremacy over
state law applies equally to an international compact.[147]  A[I]n respect of
our foreign relations generally, state lines disappear.  As to such purposes the State of New York
does not exist.@[148]








In Pink, the Supreme Court
recognized the Litvinov Assignment=s supremacy over a New York court
order.[149]  The state court had directed Pink, New York=s Superintendent of Insurance, to pay
foreign creditors= claims with assets previously held by the First Russian
Insurance Company.[150]  The Court ruled that the United States was
entitled to those assets  under the
Litvinov Assignment because the Soviet Government was the successor of the
First Russian Insurance Company.[151]  The Court observed that the United States= claims against the Russian
Government and its nationals were long-standing impediments to the United
States= recognition of the Soviet Government.[152]  Acknowledging that the President has implied
powers in the field of foreign relations, the Court stated:

It was the
judgment of the political department that full recognition of the Soviet
Government required the settlement of all outstanding problems including the
claims of our nationals. Recognition and the Litvinov Assignment were
interdependent.  We would usurp the
executive function if we held that that decision was not final and conclusive
in the courts.[153]








Relying on Belmont,
the Court declared that the Litvinov Assignment has a Asimilar dignity@ to a treaty under
the Supremacy Clause[154]
and noted that Astate law must yield when it is
inconsistent with, or impairs the policy or provisions of . . . an
international compact or agreement.@[155]  The Court went on to conclude:

The action of New York in this case
amounts in substance to a rejection of a part of the policy underlying
recognition by this nation of Soviet Russia. Such power is not accorded a State
in our constitutional system. To permit it would be to sanction a dangerous
invasion of Federal authority.[156]

 

In Dames &
Moore, when diplomatic officials were held hostage after the seizure of the
American Embassy in Tehran, Iran, the President issued an executive order that Ablocked the
removal or transfer of >all property and interests in property of
the Government of Iran, its instrumentalities and controlled entities and the
Central Bank of Iran which are or  become
subject to the jurisdiction of the United States=@ under the International Emergency
Economic Powers Act (IEEPA).[157]  

Iran released the hostages after it
entered into an agreement with the United States to settle their claims, which
included the termination of A>all litigation as between the
Government of each party and the nationals of the other, and to bring about the
settlement and termination of all such claims through binding arbitration.=@[158] 
Additionally, the United States was obligated to transfer all Iranian
assets in the United States to a bank to satisfy any award made by the tribunal
against Iran.[159]








The President also issued several
executive orders Aimplementing the terms of the agreement.@[160]

These Orders revoked all licenses
permitting the exercise of >any right, power, or privilege= with regard to Iranian funds,
securities, or deposits; >nullified= all non-Iranian interests in such assets acquired subsequent
to the blocking order  . . . ; and
required those banks holding Iranian assets to transfer them >to the Federal Reserve Bank of New
York, to be held or transferred as directed by the Secretary of the Treasury.=[161]

Later, the President issued an
executive order A>suspend[ing]= all >claims which may be presented to the
. . . Tribunal= and provided that such claims >shall have no legal effect in any
action now pending in any court of the United States.=@[162]

Dames & Moore filed suit against
the United States and the Secretary of the Treasury Ato prevent enforcement of the
Executive Orders and Treasury Department regulations implementing the Agreement
with Iran,@[163] arguing that the President exceeded
his statutory and constitutional authority.[164]  








The Supreme Court implemented Justice
Jackson=s Presidential powers framework when
it considered whether the President was authorized to (1) nullify attachments
made after the blocking order, (2) order the transfer of all Iranian assets to
the Federal Reserve Bank, and (3) suspend pending court claims.[165]  As to the first two, the Court determined
that the IEEPA specifically authorized the President=s actions, so those actions were,
therefore, A>supported by the strongest of
presumptions and the widest latitude of judicial interpretation . . . .=@[166] 
Because A[a] contrary ruling would mean that the Federal Government as
a whole lacked the power exercised by the President,@ the Court held that Dames &
Moore did not overcome the presumption in the President=s favor.[167]


















As to the third, the Court determined
that the IEEPA and Hostage Act did not specifically authorize the President to
suspend claims pending in United States courts.[168]  The Court, however, found those Astatutes highly relevant in the
looser sense of indicating congressional acceptance of a broad scope for
executive action in circumstances such as those presented in this case.@[169] 
The Court reasoned that the IEEPA gives the President Abroad authority . . . to act in times
of national emergency with respect to property of a foreign country,@ and the Hostage Act Aindicates congressional willingness
that the President have broad discretion when responding to the hostile acts of
foreign sovereigns.@[170] 
The Court went on to state: A[W]e cannot ignore the general tenor
of Congress= legislation in this area in trying
to determine whether the President is acting alone or at least with the
acceptance of Congress.@[171] 
Because ACongress cannot anticipate and legislate with regard to every
possible action the President may find it necessary to take,@ a lack of specific congressional
approval does not imply disapproval.[172]  In fact, Congress may A>invite=@ the exercise of independent
presidential authority where there is no indication that Congress sought to
limit it and there is a history of congressional acquiescence.[173]  Turning to that history, the Court observed
that the United States had regularly settled claims against foreign nations on
behalf of its nationals by executive agreement[174]
and that ACongress has implicitly approved
[that] practice . . . .@[175] 
Congress=s acceptance of such executive action was also demonstrated
by the enactment of, and frequent amendment of, the International Claims
Settlement Act.[176]  Furthermore, pointing to the legislative
history of the IEEPA, the Court found that Congress Aaccepted the authority of the
Executive to enter into settlement agreements.@[177] 
  Finally, referring to Pink,
the Court noted that its prior cases Arecognized that the President does
have some measure of power to enter into executive agreements without obtaining
the advice and consent of the Senate.@[178] 
The Court then held that Athe inferences to be drawn from the
character of the legislation Congress has enacted in the area, such as the
IEEPA and the Hostage Act, and from the history of acquiescence in executive
claims settlement - - we conclude that the President was authorized to suspend
pending claims . . . .@[179] 
The Court also noted that Congress had not taken any action that would
indicate that it disapproved of the agreement.[180]            In Garamendi, the United
States President and German Chancellor entered into the German Foundation
Agreement, which established a foundation funded by Germany and German
companies Ato compensate all those >who suffered at the hands of German
companies during the National Socialist era.=@[181] 
Because numerous class-action suits had been filed in the United States Aagainst companies doing business in
Germany during the National Socialist era[,]@[182] Germany=s participation in the agreement Awas conditioned on some expectation
of security from lawsuits in United States courts[.]@[183] 
It was also Aagreed that the German Foundation would work with the
International Commission on Holocaust Era Insurance Claims (ICHEIC)[,]@[184] a voluntary organization formed
before the German Foundation Agreement, which Anegotiat[ed] with European insurers
to provide information about unpaid insurance policies issued to Holocaust
victims and settle[d] . . . claims brought under them.@[185]








Before the establishment of the
German Foundation Agreement, the California Code of Civil Procedure had been
amended to enable Astate residents to sue in state court on insurance claims
based on acts perpetrated in the Holocaust[.]@[186] 
And a California statute, the Holocaust Victim Insurance Relief Act
(HVIRA), compelled insurance companies doing business in California Ato disclose the details of >life, property, liability, health,
annuities, dowry, educational, or casualty insurance policies= issued >to persons in Europe, which were in effect
between 1920 and 1945.=@[187] 
After California Asubpoenas were issued against several subsidiaries of
European insurance companies participating in the ICHEIC,@ the Deputy Secretary of State wrote
Garamendi, the California insurance commissioner, and the Governor of
California, informing them that HVIRA essentially threatened the establishment
of the German Foundation Agreement.[188]  When Garamendi vowed to Aenforce HVIRA to its fullest,@[189] 
European and United States insurance companies and the American
Insurance Association sought injunctive relief, alleging that HVIRA was
unconstitutional.[190]


Before the Supreme Court, the
insurance companies, the American Insurance Association, and the United States
as amicus curiae argued that the German Foundation Agreement preempted
HVIRA because it Ainterferes with foreign policy of the Executive Branch[.]@[191] 









The Court began by observing that A[a]lthough the source of the
President=s power to act in foreign affairs
does not enjoy any textual detail, the historical gloss on the >executive Power= vested in Article II of the
Constitution has recognized the President=s >vast share of responsibility for the
conduct of our foreign relations.=@[192] 
The Court then acknowledged the President=s authority to enter into executive
agreements and, in particular, that Congress has acquiesced to the use of those
agreements to settle claims of United States nationals against foreign
governments.[193]  Although the insurance claims at issue were
against corporations, as opposed to a foreign government, the Court found that
the distinction was not determinative because the President had acted alone in
the past to settle wartime claims against private parties.[194]








Confronting preemption, the Court
considered the issue under its decision in Zschernig v. Miller because
the German Foundation Agreement did not contain a preemption clause.[195]  In Zschernig, the Court held that an
Oregon escheat statute, which, as applied, prevented inheritance by nationals
of Communist countries,[196]
was Aan >intrusion by the State into the field
of foreign affairs which the Constitution entrusts to the President and the
Congress.=@[197] 
The Garamendi Court noted that Zschernig Arelied on statements in a number of
previous cases open to the reading that state action with more than incidental
effect on foreign affairs is preempted, even absent any affirmative federal
activity in the subject area of the state law, and hence without any showing of
conflict.@[198] 
The Court then referred to Justice Harlan=s concurring opinion in Zschernig,
in which he stated that the majority=s Aimplication of preemption of the
entire field of foreign affairs was at odds with some other cases suggesting
that in the absence of positive federal action >the States may legislate in areas of
their traditional competence even though their statutes may have an incidental
effect on foreign relations.=@[199]

Although the Court questioned whether
it was necessary to address field and conflict preemption, it decided that even
under AJustice Harlan=s view, the likelihood that state
legislation will produce something more than incidental effect in conflict with
express foreign policy of the National Government would require preemption of
the state law.@[200] 
Nevertheless, because Justice Harlan believed that state legislation
within its traditional competence may enable the state to prevail, the Court
determined Ait would be reasonable to consider
the strength of the state interest, judged by standards of traditional
practice, when deciding how serious a conflict must be shown before declaring
the state law preempted.@[201]

Evaluating the President=s action first, the Court concluded
that the German Foundation Agreement was Awithin the traditional subject matter
of foreign policy in which national, not state, interests are overriding . . .
.@[202] 
The Court acknowledged that 

[t]he approach taken serves to
resolve the several competing matters of national concern apparent in the
German Foundation Agreement: the national interest in maintaining amicable
relationships with current European allies; survivors= interests in a >fair and prompt= but nonadversarial resolution of
their claims so as to >bring some measure of justice . . . in their lifetimes=; and the companies= interest in securing >legal peace= when they settle claims in this
fashion.[203]








Looking then to California=s interests, the Court determined
those interests were weak when considered Aagainst the backdrop of traditional
state legislative subject matter[.]@[204] 
Although California had an interest in consumer protection, the Court
noted that by limiting HVIRA to certain policies, it was Adoubt[ful] that the purpose of the
California law [was] an evaluation of corporate reliability in contemporary
insuring in the State.@[205] 
The Court also considered California=s interest in vindicating Athe claims of Holocaust survivors@ but determined Athat the very same objective
dignifies the interest of the National Government in devising its chosen
mechanism for voluntary settlements, there being about 100,000 survivors in the
country, only a small fraction of them in California.@[206]








The Court held that the German
Foundation Agreement preempted HVIRA, reasoning, that: HVIRA Aundercuts the President=s diplomatic discretion and the
choice he has made exercising it@;[207]
Athe President=s authority to provide for settling
claims in winding up international hostilities requires flexibility in wielding
>the coercive power of the national
economy= as a tool of diplomacy@;[208]
and AHVIRA is an obstacle to the success
of the National Government=s chosen >calibration of force= in dealing with the Europeans using
a voluntary approach.@[209]

Turning to the case before us, we
conclude that the reliance on the President=s power to enter into executive
agreements to settle disputes with other nations, and even corporations under
the limited circumstances described in Garamendi, by Medellín and the
United States is misplaced.  The
President has not entered into any such agreement with Mexico relating to the
Mexican nationals named in the Avena decision.  There has been no settlement.  Rather, the presidential memorandum is a
unilateral act executed in an effort to achieve a settlement with Mexico. 













The President=s independent foreign affairs power
to enter into an executive agreement to settle a dispute with a foreign nation
under Article II of the Constitution[210]
Ahas received congressional
acquiescence throughout its history . . . .@[211] 
But there is no similar history of congressional acquiescence relating
to the President=s authority to unilaterally settle a dispute with another
nation by executive order, memorandum, or directive.[212]  So, when issuing the February 28, 2005,
memorandum, the President=s authority was not at its maximum because the President did
not act Apursuant to an express or implied
authorization of Congress[.]@[213] With the President=s power not being at its zenith here,
we must ask whether the President has acted in the Aabsence of either a congressional
grant or denial of authority[.]@[214] 
Implied congressional ratification of the President=s settling of claims with foreign
nations is a Apractice [that] goes back over 200
years to the first Presidential administration . . . .@[215] 
Here, the President=s unprecedented unilateral action of issuing this memorandum
does not fall into the category of presidential power employed in a Azone of twilight@ or where  Acongressional inertia, indifference
or quiescence@ enabled or invited the conduct of
the President.[216]  In this context, it is evident that the
President=s independent power to settle a
dispute with a foreign nation, recognized throughout the nation=s history, depends on the existence
of an executive agreement.  Given the
extraordinary conduct of the President, unsupported by a history of
congressional acquiescence, we find that the President=s chosen method for resolving this
country=s dispute with Mexico is Aincompatible with the . . . implied
will of Congress[.]@[217] 
Accordingly, in this instance, we find that the exercise of the
President=s foreign affairs power Ais at its lowest ebb[.]@[218] 
Having acted contrary to the implied will of Congress, we conclude that
the President has exceeded his inherent constitutional foreign affairs
authority by directing state courts to comply with Avena.  

The United States submits that
requiring a formal bilateral agreement would (1) A>hamstring the President in settling
international controversies=[219] and weaken this nation=s ability to fulfill its treaty
obligations@; (2) Afail to recognize the practical
reality that there are occasions when a foreign government may acquiesce in a
resolution that it is unwilling to formally approve@; (3) Afail to recognize that obtaining a
formal agreement can be a time consuming process that is ill-suited for
occasions when swift action is required@; and (4) Ahave the perverse effect of assigning
to a foreign government veto power over the President=s exercise of his authority over
foreign affairs.@[220]








Contrary to the United States= contentions, requiring a formal
bilateral agreement does not limit or constrain the President=s ability to settle international
controversies or comply with treaty obligations.  The President=s ability to negotiate and enter into
an executive agreement to settle a dispute with a foreign nation remains.  In this case, however, the President failed
to avail himself of that mechanism to settle this nation=s dispute with Mexico.  And although it may be time-consuming to
obtain an executive agreement, the need for Aswift action@ does not override what the
Constitution requiresCan international compact or agreement.

A necessary component of any
executive agreement is the negotiation process that precedes it, which ensures
that each sovereignty is represented and heard. 
What is ultimately achieved through that process, which invariably
involves compromise, will reflect a meeting of the mindsCa settlement that embodies the terms,
conditions, rights, and obligations agreed to during the negotiation
process.  At odds with this is the notion
that a Aforeign government may acquiesce in a
resolution that it is unwilling to formally approve.@ 
A Presidential resolution that is based on an evaluation of the means
necessary to resolve a dispute and then implemented in anticipation of future
acquiescence by a foreign government is not a settlement.  The mere possibility of later acquiescence by
a foreign government is speculation. 
Representatives of foreign governments change, and with them,
international relations are subject to modification.  When it comes to foreign relations, history
has proven that a nation deemed an ally on one day, may on the next, be
declared an enemy.  Finally, the view
that an executive agreement allows Aa foreign government veto power over
the President=s exercise of his foreign affairs
powers@ undermines the purpose of the
negotiation processCthe accomplishment of an actual settlement.  








 The absence of an executive agreement between
the United States and Mexico is central to our determination that the President
has exceeded his inherent foreign affairs power by ordering us to comply with Avena.  We must make clear, however, that our
decision is limited to the issue before usCthe effect of the President=s February 28, 2005, memorandum.  Therefore, we express no opinion about
whether an executive agreement between the United States and Mexico providing
for state court compliance with Avena would preempt state law. 

Medellín also relies on the President=s duty to faithfully execute the laws
as provided in Article II, Section 3 of the Constitution.[221]  According to Medellín, the President Ahas both the authority and the duty
to enforce the United States=s treaty obligations within the domestic legal system@ because, under the Supremacy Clause,
treaties are supreme.[222]  Related to this argument is Medellín=s contention that 

the President has done nothing more
than confirm that the United States will do what it has already promised to doCabide by the decision of the ICJ in a
dispute concerning the interpretation and application of the Vienna
Convention.  That promise was made by [a]
constitutionally prescribed process when the President, with the advice and
consent of the Senate, entered into the Vienna Convention, the Optional
Protocol, the U.N. Charter, and the ICJ Statute.[223]








The Supreme Court=s determination about the domestic
effect of ICJ decisionsCthat they are entitled only to A>respectful consideration=@[224]Cbased on its interpretation of the
Statute of the ICJ and the United Nations Charter in Sanchez-Llamas[225]
forecloses any argument that the President is acting within his authority to
faithfully execute the laws of the United States.  By directing state courts to give effect to Avena,
the President has acted as a lawmaker. 
But, as Justice Black explained in Youngstown Sheet & Tube,
A[i]n the framework of our
Constitution, the President=s power to see that the laws are faithfully executed refutes
the idea that he is to be a lawmaker.@[226] 
The President=s February 28, 2005, determination cannot be sustained under
the power of the Executive to ensure that the laws are faithfully executed.








Relying again on the enumerated
powers of the President, Medellín also contends that A[t]he Constitution explicitly vests
the President with authority over diplomatic and consular relations.@[227] 
He argues: ANo power is more clearly Presidential than the authority to
protect U.S. citizens and their interests abroad.@[228] 
He contends that the ability of the United States to protect its
citizens may be compromised if the United States does not comply with Avena.  Looking to statutory authority, Medellín
maintains that by virtue of Title 22 United States Code, Sections 1732 and
402(a)(1)(D), ACongress has specifically referenced
the President=s duty in the context of protecting
U.S. citizens who have been detained or arrested in foreign lands, . . . and in
requiring the President to protect foreign nationals in the United States[.]@[229] 
    Under Article II, Section 2, Clause
2 of the Constitution,
the President Aby and with the Advice and Consent of
the Senate, shall appoint Ambassadors, other public Ministers and Consuls . . .
.@[230] 
And under Article II, Section 3, the President Ashall receive Ambassadors and other
public Ministers . . . .@[231]

The Hostage Act, Title 22, United
States Code, Section 1732, states:

Whenever it is made known to the
President that any citizen of the United States has been unjustly deprived of
his liberty by or under the authority of any foreign government, it shall be
the duty of the President forthwith to demand of that government the reasons of
such imprisonment; and if it appears to be wrongful and in violation of the
rights of American citizenship, the President shall forthwith demand the
release of such citizen, and if the release so demanded is unreasonably delayed
or refused, the President shall use such means, not amounting to acts of war
and not otherwise prohibited by law, as he may think necessary and proper to
obtain or effectuate the release; and all the facts and proceedings relative
thereto shall as soon as practicable be communicated by the President to
Congress.[232]

 

Further, Title 22,
United States Code, Section 4802, which defines the AResponsibility of
the Secretary of State,@ provides in relevant part:

(a) Security functions.(1) The Secretary of State
shall develop and implement (in consultation with the heads of other Federal
agencies having personnel or missions abroad where appropriate and within the
scope of the resources made available) policies and programs, including funding
levels and standards, to provide for the security of United States Government
operations of a diplomatic nature and foreign government operations of a
diplomatic nature in the United States. Such policies and programs shall includeC

 

* * * 








(D) protection of foreign missions, international
organizations, and foreign officials and other foreign persons in the United
States, as authorized by law.[233]

 

We have no doubt that the President
and other executive branch officials play a vital role in protecting the
interests of American citizens abroad when necessary.  However, we do not construe the
constitutional provisions as expressly or implicitly granting  the President the authority to mandate state
court compliance with the ICJ Avena decision, and Medellín cites no
precedent that would lead us to conclude otherwise.  

Nor can the
statutes be read to authorize the President=s independent
action in this case.  First, there is no
indication that the Hostage Act specifically grants the President unlimited
power to act when the President=s objective is to
protect the interests of American citizens traveling or residing abroad.  In Dames & Moore, the Supreme
Court reviewed the legislative history of the Hostage Act: 

Congress in 1868 was concerned with
the activity of certain countries refusing to recognize the citizenship of
naturalized Americans traveling abroad, and repatriating such citizens against
their will. These countries were not
interested in returning the citizens in exchange for any sort of ransom. This
also explains the reference in the Act to imprisonment >in violation of the rights of American citizenship.=[234]

 













The Court further observed that the
proponents of the Act Aargued that >something must be intrusted to the Executive= and that >the President ought to have the power
to do what the exigencies of the case require to rescue a citizen from imprisonment.=@[235] 
When determining whether the President had the authority to suspend
claims in American courts, the Court found that the Hostage Act Aindicates congressional willingness
that the President have broad discretion when responding to the hostile acts of
foreign sovereigns.@[236] 
But implied congressional authority vested in the President to protect
United States citizens in response to the hostile acts of another nation where
the circumstances are exigent shows that the President=s power to protect United States
citizens abroad is not unqualified.  We
cannot accept Medellín=s argument that the Hostage Act grants the President
unfettered authority to act to protect the interest of United States citizens
abroad.  It strains logic to conclude
that the power delegated to the President under the Hostage Act permits the
President to engage in any conduct that will ensure the maintenance of that
power.  Nevertheless, we need not decide
the scope of any implied power conferred to the President under the Hostage
Act, because, as we have already concluded in this case, Athere is [not] a history of
congressional acquiescence in conduct of the sort engaged in by the President.@[237] 
When concluding that the President had the authority to suspend pending
court claims in Dames & Moore, the Court relied on not only the
President=s power under the Hostage Act, but on
the President=s power under the International
Emergency Economic Powers Act and the President=s power to settle claims with foreign
nations by executive agreement.[238]  In doing so, the Court specifically noted: ACrucial to our decision today is the
conclusion that Congress has implicitly approved the practice of claim
settlement by executive agreement.@[239] 
We decline to find that the Hostage Act authorizes the President to
order this Court to comply with Avena.

Although Section
4802(a)(1)(D), Title 22, United States Code, provides that the Secretary of
State[240]
has the duty to protect Aforeign missions, international
organizations, and foreign officials and other foreign persons in the United
States,@ that duty extends
only to things A>authorized by law.=@[241]  The statute, therefore, cannot be regarded as
an independent source of authority for the President=s memorandum
ordering state courts to comply with Avena. 








In further support of its position
that the President has the authority to direct state courts to give effect to
the ICJ Avena decision, the United States directs us to the United Nations
Charter and the United Nations Participation Act.  The United States maintains that the
ratification of the Charter Aimplicitly grants the President >the lead role= in determining how to respond to an
ICJ decision.@[242] 
And under the United Nations Participation Act, according to the United
States, the President, through appointed officials, Arepresents the United States in the
United Nations, including before the ICJ and in the Security Council.@[243] 
Moreover, the United States argues that Congress Aexpressly anticipated that these
officials would . . . perform >other functions in connection with the participation of the
United States in the United Nations= at the direction of the President or
his representative to the United Nations.@[244] 

Titled ARepresentation in Organization,@ Title 22, United States Code,
Section 287 provides in part:

(a) Appointment of representative;
rank, status and tenure; duties.  The
President, by and with the advice and consent of the Senate, shall appoint a
representative of the United States to the United Nations who shall have the
rank and status of Ambassador Extraordinary and Plenipotentiary and shall hold
office at the pleasure of the President. 
Such representative shall represent the United States in the Security
Council of the United Nations and may serve ex officio as representative of the
United States in any organ, commission, or other body of the United Nations
other than specialized agencies of the United Nations, and shall perform such
other functions in connection with the participation of the United States in
the United Nations as the President may, from time to time, direct.








(b) Appointment of additional representatives; rank,
status and tenure; duties; reappointment unnecessary.  The President, by and with the advice and
consent of the Senate, shall appoint additional persons with appropriate
titles, rank, and status to represent the United States in the principal organs
of the United Nations and in such organs, commissions, or other bodies as may
be created by the United Nations with respect to nuclear energy or disarmament
(control and limitation of armament). 
Such persons shall serve at the pleasure of the President and subject to
the direction of the Representative of the United States to the United
Nations.  They shall, at the direction of
the Representative of the United States to the United Nations, represent the
United States in any organ, commission, or other body of the United Nations,
including the Security Council, the Economic and Social Council, and the
Trusteeship Council, and perform such other functions as the Representative of
the United States is authorized to perform in connection with the participation
of the United States in the United Nations. 
Any Deputy Representative or any other officer holding office at the
time the provisions of this Act, as amended, become effective shall not be
required to be reappointed by reason of the enactment of this Act, as amended.[245]

 

Starting with the United Nations
Charter, we hold it does not authorize the type of action that the President
has taken here.  The President is still
bound by the Constitution when deciding how the United States will respond to
an ICJ decision,[246]
and, as stated above, the President exceeded his implied foreign affairs power
by directing state courts to give effect to Avena.








Additionally, the subsections of the
United Nations Participation Act set forth above do not support the President=s determination.  Because the participation of the United
States in proceedings before the ICJ does not bind the courts of this country
to comply with a decision of the ICJ,[247]
it necessarily follows that the participation of the United States in the
United Nations does not authorize the President to order state courts to give
effect to any decision rendered by the ICJ.

Based on the
foregoing, we hold that the President=s memorandum
ordering us to give effect to the ICJ Avena decision cannot be sustained
under the express or implied constitutional powers of the President relied on
by Medellín and the United States or under any power granted to the President
by an act of Congress cited by Medellín and the United States.[248]  As such, the President has violated the
separation of powers doctrine by intruding into the domain of the judiciary,
and therefore, Medellín cannot show that the President=s memorandum
preempts Section 5.

C.        Section
5(a)(1), Article 11.071 of the Texas Code of Criminal Procedure      

We now consider whether Medellín has
satisfied the requirements of Article 11.071, Section 5(a)(1) of the Texas Code
of Criminal Procedure so as to permit this Court to review and reconsider his
Vienna Convention claim.  Section 5(a)(1)
provides: 

If a subsequent application for a
writ of habeas corpus is filed after filing an initial application, a court may
not consider the merits of or grant relief based on the subsequent application
unless the application contains sufficient specific facts establishing that:

the current claims and issues have not been and could
not have been presented previously in a timely initial application or in a
previously considered application filed under this article . . . because the
factual or legal basis for the claim was unavailable on the date the applicant
filed the previous application[.][249]








Medellín contends that the Avena
decision and the Presidential memorandum serve as previously unavailable
factual and legal bases because both issued after his first application was
denied.  The State maintains that the
legal basis for Medellín=s claim, the Vienna Convention, was available before his
trial and when he filed his first application. 
Medellín claims, however, that he is not reasserting the same claim
presented on his first application; he contends that the Avena decision
and the President=s memorandum provide him with the right to prospective review
and reconsideration.  We will address
whether the Avena decision or the Presidential memorandum qualify as a
new factual or legal basis under Section 5(a)(1) separately.

1.   Factual
Basis

Section 5(e) of Article 11.071 states:

 

For purposes of Subsection (a)(1), a factual basis of
a claim is unavailable on or before a date described by Subsection (a)(1) if
the factual basis was not ascertainable through the exercise of reasonable
diligence on or before that date.[250]  

 

What constitutes a Afactual basis@ under Section 5(a)(1) is not
defined.  Therefore,  to determine whether Avena or the
President=s memorandum qualify as a previously
unavailable factual basis under Section 5(a)(1), we must perform a
statutory-construction analysis to determine the meaning of Afactual.@








When interpreting a statute, Awe seek to effectuate the >collective= intent or purpose of the legislators
who enacted the legislation.@[251] 
In doing so, we examine the Aliteral text@[252] of a statute, which includes all
words and phrases,[253]
Ato discern the fair, objective
meaning of that text at the time of its enactment.@[254] 
And Aif the meaning of the statutory text,
when read using the established canons of construction relating to such text,
should have been plain to the legislators who voted on it, we ordinarily give
effect to that plain meaning.@[255] 
We will not give effect to the plain meaning of a statute=s text if, when applied, it leads to
an absurd result that could not have been intended by the Legislature.[256]  When the application of a statute=s literal text leads to an absurd
result, or the text is ambiguous, we consult extratextual sources to determine
a statute=s meaning.[257]








In determining the plain meaning of Afactual@ in Section 5(a)(1), we are guided by
the applicable canons of construction, Article 3.01 of the Code of Criminal
Procedure, which governs how words in the Code are to be understood,[258]
and Section 311.011 of the Texas Government Code (the Code Construction Act),
which provides for the common and technical use of words in the Code.[259]  Article 3.01 of the Code of Criminal
Procedure states that A[a]ll words, phrases and terms used in this Code are to be
taken and understood in their ususal acceptation in common language, except
where specially defined.@[260] 
The Code Construction Act provides: AWords and phrases shall be read in
context and construed according to the rules of grammar and common usage.@[261]








To discern what the usual acceptation
of the word Afactual@ is in common language or how it is
construed according to the rules of common usage, we look to dictionary
definitions.[262]  The word Afactual,@ according to Webster=s Third New International Dictionary, means Aof, relating to, or concerned with
facts@ and Arestricted to, involving, or based on
fact . . . .@[263] 
The Dictionary of Modern American Usage offers two additional
definitionsCAof or involving facts@ and Atrue.@[264] 
Illustrating the difference between the two definitions, the Dictionary
of Modern American Usage states that the first meaning Aappears in phrases such as factual
finding and factual question,@ while the second meaning Aappears in phrases such as factual
account and factual narrative.@[265] 
The meaning of Afactual@ in Section 5(a)(1) falls within the first category of
phrases described in the Dictionary of Modern American Usage because Afactual@ is paired with the word Abasis.@ 
We turn our attention to the meaning of the word Afact@ according to its usual acceptation
in common language and the rules of common usage. 








Our review of multiple dictionaries
reveals that there are numerous definitions for the word Afact.@[266] 
For instance, Webster=s Third New International Dictionary alone contains six definitions.[267]  Although there are a variety of definitions
for the word Afact,@ it must be considered in the context
in which it appears.[268]  We find it instructive that the Legislature
expressly distinguished factual basis (fact) from legal basis (law) in Section
5(a)(1).  This distinction accounts for
the two necessary, but separate, parts of any subsequent claim: the factual
basis and the legal basis.  With this in
mind, we find that the following definition of Afact@ from Black=s Law Dictionary accurately reflects the Legislature=s intent: A[a]n actual or alleged event or
circumstance, as distinguished from its legal effect, consequence, or
interpretation.@[269] 
Giving effect to the plain meaning of Afact@ does not lead to an absurd result
that the Legislature could not have intended. 
It is the application of the law to a fact or set of facts that yields
the legal effect, consequence, or interpretation.  And in some cases, the legal effect,
consequence, or interpretation creates a new rule of law.[270]








The actual event or circumstance
involved in Medellín=s case is that law enforcement authorities did not inform
Medellín of his right to contact the Mexican consulate after his  arrest as required by Article 36(1)(b).  This fact provided the factual basis for
Medellín=s challenge to his conviction and
sentence under the Vienna Convention on his first application for a writ of
habeas corpus.  We disposed of this claim
on an independent state ground.[271]  Agreeing with the trial court, we found that
the legal effect or consequence of Medellín=s Vienna Convention claim resulted in
the application of our state procedural default rule due to Medellín=s failure to object at trial.[272]


Medellín now argues that Avena
is a previously unavailable factual basis for purposes of Section 5(a)(1).  We disagree. 
For purposes of Section 5(a)(1), the Avena decision is properly
categorized as law, even though it is not binding on us.[273]  The ICJ=s decision in Avena is not a
fact and, therefore, does not qualify as a previously unavailable factual basis
under Section 5(a)(1). 

As to the President=s memorandum, Medellín asserts that A[a] judgment giving rise to new
claims issued after an applicant=s habeas application renders the
factual basis of the claim >unavailable= under Section 5(a).@[274] 
Thus, he urges, the President=s memorandum is a new Afactual basis@ entitling him to review.  We also disagree with this argument.








Medellín broadly claims that Awhether considered as a factual or
legal basis . . . the President=s Determination was [not] available at the time of his
initial application for purposes of Section 5(a)@ without further explanation as to
how the memorandum constitutes a Afactual@ basis.[275]  Medellín=s arguments, however, address the
memorandum exclusively as a legal, not factual, basis; he argues that the
President=s memorandum Aconstitutes a binding federal rule of
decision.@ 
But even if Medellín had devised a complete argument that the President=s memorandum constitutes a Afactual basis,@ we would still reach the same
conclusion.  The President=s memorandum directs the state courts
to give effect to the ICJ Avena decision, and in so doing, the President
specifically relies on his authority under Athe Constitution and the laws of the
United States of America . . . .@[276] 
This indicates that the President intended his memorandum to have the
effect of law.  According to our earlier
analysis of Afactual,@ we determined that the word means Aof or involving@[277] A[a]n actual or alleged event or
circumstance, as distinguished from its legal effect, consequence, or interpretation.@[278] 
Here, even though we have concluded that the President=s memorandum is not binding federal
law as argued by Medellín and the United States, we cannot say that the
memorandum falls into that definition. For purposes of Section 5(a)(1), like
the Avena decision, the President=s memorandum is properly classified
as a Alegal basis,@ not a factual one.  

2.   Legal
Basis

Because neither the Avena
decision nor the President=s memorandum constitute a Afactual basis,@ we now consider whether either
qualifies as a previously unavailable Alegal basis@ under Section 5(a)(1).  Section 5(d) of Article 11.071 states:  








a legal basis of a claim is
unavailable on or before a date described by Subsection (a)(1) if the legal
basis was not recognized by or could not have been reasonably formulated from a
final decision of the United States Supreme Court, a court of appeals of the
United States, or a court of appellate jurisdiction of this state on or before
that date.[279]

Although the Avena decision
and the Presidential memorandum were not available when Medellín filed his
first application, neither constitutes a new legal basis under the plain
language of Section 5(d).[280]  First, neither has been recognized as providing
a right to review and reconsideration in Aa final decision of the United States
Supreme Court, a court of appeals of the United States, or a court of appellate
jurisdiction of this state . . . .@[281] 
Indeed, as we noted earlier, the United States Supreme Court recently
reaffirmed its holding in BreardCthat procedural default rules may bar
Vienna Convention claims.[282]  In Sanchez-Llamas, the Supreme Court
concluded that Avena is entitled to only A>respectful consideration,=@[283] and as such, that decision is not
binding on us.  Likewise, because
we have concluded that the President has exceeded his authority by ordering
state courts to give effect to Avena, the President=s determination is
not binding federal law.  Because Avena and the
President=s memorandum are not binding law,
neither of them can serve as a previously unavailable legal basis for purposes
of Section 5(a)(1).  

IV. CONCLUSION








Having found that the ICJ Avena
decision and the Presidential memorandum do not constitute binding federal law
that preempt Section 5 under the Supremacy Clause of the United States
Constitution and that neither qualify as a previously unavailable factual or
legal basis under Section 5(a)(1), we dismiss Medellín=s subsequent application for a writ
of habeas corpus under Article 11.071, Section 5. 

 

DATE DELIVERED: November 15, 2006

PUBLISH

 











[1] 
Medellín v. State, No. AP-71,997, slip op. (Tex. Crim. App. Mar.
19, 1997) (not designated for publication).                     





[2]  Ex parte Medellín, No. 675430-A (339th
Dist. Ct. Jan. 22, 2001). 





[3] 
Ex parte Medellín, No. WR-50,191-01 (Tex. Crim. App. Oct. 3,
2001) (not designated for publication).





[4] 
Medellín v. Cockrell, Civ. No. H-01-4078 (S.D. Tex. Apr. 17,
2003).  





[5] 
Case Concerning Avena and other Mexican Nationals (Mex. v. U.S.), 2004 I.C.J. No. 128 (Judgment of
Mar. 31).





[6] 
Id. && 13B16, 49.





[7] 
Id. && 90, 106, 140.





[8] 
Id. && 138B40.





[9] 
Id. & 121.





[10] 
Id. && 112B13, 153(9), (11).





[11] 
Medellín v. Dretke, 371 F.3d 270, 273, 281 (5th Cir. 2004).





[12] 
Id. at 280 (citing Breard v. Greene, 523 U.S. 371 (1998)).





[13] 
Id. (citing United States v. Jimenez-Nava, 243 F.3d 192,
198 (5th Cir. 2001)).





[14] 
Medellín v. Dretke, 543 U.S. 1032 (2004).





[15] 
President=s
Memorandum for the Attorney General, Subject: Compliance with the Decision of
the International Court of Justice in Avena (Feb. 28, 2005), available at
http://www.whitehouse.gov/news/releases/

2005/02/20050228‑18.html [hereinafter Presidential Memorandum].





[16] 
Ex parte Medellín, Application No. AP-75,207.





[17]  Medellín v. Dretke, 125 S. Ct. 2088, 2092
(2005) (per curiam). 





[18] 
Ex parte Medellín, No. AP-75,207 (per curiam order) (designated
for publication).





[19]  Tex. Code Crim. Proc. art. 11.071 ' 5(a)(1) (Vernon 2003).





[20] 
Id. ' 5(a)(2).





[21] 
Id. ' 5(a)(3).





[22] 
Ex parte Medellín, No. AP-75,207 (per curiam order) (designated
for publication).





[23] 
Id.; see 28 C.F.R. _ 0.5 (2005).





[24] 
Br. of Applicant at 26B27.





[25] 
Id. at 52B53.





[26] 
Br. of Respondent at 20B21.





[27] 
Br. of United States as Amicus Curiae at 12.





[28] 
Id. at 15.





[29] 
United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318
(1936) (Aoperations of the nation in such
[foreign] territory must be governed by treaties, international understandings
and compacts, and the principles of international law.@); Santovincenzo v. Egan,
284 U.S. 30, 40 (1931); B. Altman & Co. v. United States, 224 U.S.
583, 600 (1912); Head Money Cases (Edye v. Robertson), 112 U.S.
580, 598 (1884); Rocha v. State, 16 S.W.3d 1, 15B16 (Tex. Crim. App. 2000). 





[30] 
Head Money Cases, 112 U.S. at 598.





[31] 
Id.; see also Whitney v. Robertson, 124 U.S. 190, 194
(1888) (AIf the country with which the
treaty is made is dissatisfied with the action of the legislative department,
it may present its complaint to the executive head of the government, and take
such other measures as it may deem essential for the protection of its
interests.  The courts can afford no
redress.@); Baldwin v. Franks, 120
U.S. 678, 702B03 (1887) (Field, J., dissenting)
(when a treaty between the United States and another county is considered as a
compact between nations, as opposed to the law of the land, a violation of the
treaty is a matter Ato be settled by negotiation
between the executive departments of the two governments, each government being
at liberty to take such measures for redress as it may deem advisable.@); Foster v. Neilson, 27
U.S. 253, 307 (1829) (AThe judiciary is not that
department of the government, to which the assertion of its interests against
foreign powers is confided; and its duty commonly is to decide upon individual
rights, according to those principles which the political departments of the
nation have established.@). 





[32] 
U.S. Const. art. II, ' 2, cl. 2; see also B. Altman
& Co., 224 U.S. at 600; De Lima v. Bidwell, 182 U.S. 1, 194
(1901).





[33] 
U.S. Const. art. VI, cl.
2; see also Head Money Cases, 112 U.S. at 598. 





[34] 
Whitney, 124 U.S. at 194.





[35]  Reid v. Covert, 354 U.S. 1, 17 (1957)
(plurality opinion); Geofroy v. Riggs, 133 U.S. 258, 267 (1890); Cherokee
Tobacco, 78 U.S. 616, 620 (1871) (Aa treaty cannot change the Constitution or be held valid if
it be in violation of that instrument.@); Rocha, 16 S.W.3d at n.12.                   





[36] 
Whitney, 124 U.S. at 194; see also Sanchez-Llamas v. Oregon,
126 S. Ct. 2680 (2006); Head Money Cases, 112 U.S. at 599.





[37] 
Whitney, 124 U.S. at 194.





[38]  Id.





[39] 
United States v. Pink, 315 U.S. 203, 230 (1942).





[40]  Id. at 230B31.





[41] 
Head Money Cases, 112 U.S. at 598. 





[42] 
Id. at 599.





[43] 
Id.





[44] 
Sorto v. State, 173 S.W.3d 469, 478 (Tex. Crim. App. 2005)
(quoting Restatement (Third) of Foreign
Relations Law of the United States ' 907 cmt. a, at 395 (1987) and citing Hamdan v.
Rumsfeld, 415 F.3d 33, 38B40 (D.C. Cir. 2005), overruled on other grounds by 126
S. Ct. 2749 (2006)); see also Hinojosa v. State, 4 S.W.3d 240, 252 (Tex.
Crim. App. 1999) (AGenerally, individuals do not have
standing to bring suit based on an international treaty when sovereign nations
are not involved in the dispute.@).





[45] 
Sorto, 173 S.W.3d at 478 n.31 (citing United States v.
Jimenez-Nava, 243 F.3d 192, 195 (5th Cir. 2001); United States v. Li,
206 F.3d 56, 67 (1st Cir. 2000) (Selya & Boudin, JJ., concurring); United
States ex. rel. Lujan v. Gengler, 510 F.2d 62, 67 (2d Cir. 1975); United
States v. Rosenthal, 793 F.2d 1214, 1232 (11th Cir. 1986)); see also
United States v. Emuegbunam, 268 F.3d 377, 389 (6th Cir. 2001) (Acourts presume that the rights
created by an international treaty belong to a state and that a private
individual cannot enforce them.@); United States ex rel. Saroop v. Garcia, 109 F.3d
165, 167 (3d Cir. 1997) (ABecause treaties are agreements
between nations, individuals ordinarily may not challenge treaty
interpretations in the absence of an express provision within the treaty or an
action brought by a signatory nation.@); Goldstar (Panama) S.A. v. United States, 967 F.2d
965, 968 (4th Cir. 1992) (AInternational treaties are not presumed to create rights
that are privately enforceable.@); Matta-Ballesteros v. Henman, 896 F.2d 255, 259
(7th Cir. 1990) (AIt is well established that
individuals have no standing to challenge violations of international treaties
in the absence of a protest by the sovereigns involved.@). 
But see Sanchez-Llamas, 126 S. Ct. at 2697 (Breyer, J.,
dissenting) (stating Ano such presumption exists.@).





[46] 
U.N. Charter introductory note, art. 110, para. 3, 59 Stat. 1031; see
also Basic Facts about the United Nations, The United Nations:
Organization, available at
http://www.un.org/aboutun/basicfacts/unorg.htm; Charles Patterson, The Oxford
50th Anniversary Book of the United Nations 7B21 (Oxford University Press)
(1995).





[47] 
U.N. Charter art. 92.





[48] 
Id.





[49] 
Id. art. 93, para. 1. 





[50] 
Statute of the International Court of Justice arts. 2B64, June 26, 1945, 59 Stat. 1031
[hereinafter Statute of the ICJ].





[51] 
Id. art. 36(1). 





[52] 
Id. art. 59.





[53] 
U.N. Charter art. 94, para. 1.





[54] 
Id. art. 94, para. 2.





[55] 
Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77,
596 U.N.T.S. 261 (ratified by the United States on Nov. 24, 1969) [hereinafter
Vienna Convention].





[56] 
Sorto, 173 S.W.3d at 477; see also Sanchez-Llamas, 126 S.
Ct. at 2674 (AThe Convention consists of 79
articles regulating various aspects of consular activities.@).





[57] 
Vienna Convention.





[58] 
Id.; United States v. Lombera-Camorlinga, 206 F.3d 882,
884 (9th Cir. 2000); see also Tenagne Tadesse, The Breard Aftermath:
Is the U.S. Listening?, 8 Sw. J. L.
& Trade Am. 423, 429B30 (2002) (discussing the history of the Vienna
Convention). 





[59] 
Sorto, 173 S.W.3d at 477.





[60] 
Vienna Convention, art. 36.





[61] 
Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr.
18, 1961, Art. I, 21 U.S.T. 326, T.I.A.S. No. 6820 [hereinafter Optional
Protocol].





[62] 
Presidential Memorandum;
Medellín, 125 S. Ct. at 2101 (O=Connor J., dissenting); Letter from Alberto Gonzales, U.S.
Attorney General, to Greg Abbott, Texas Attorney General  (Apr. 5, 2005); United States Department of
State, Daily Press Briefing, Mar. 10, 2005, Adam Ereli, Deputy Spokesman, available
at http://www.state.gov/r/pa/prs/dpb/2005/43225.htm (stating Ain recognition of the optional
protocol and our international commitments, the President has determined that
the United States will comply with the judgment of the International Court of
Justice and that we will review -- our state courts will review -- the cases
that ICJ responded to.@).





[63] 
Case Concerning the Vienna Convention on Consular Relations (Para. v.
U.S.), Application of the Republic of Paraguay, Apr. 3, 1998; see also
Breard, 523 U.S. at 374. 





[64]  Breard, 523 U.S. at 374.  





[65] 
Id.





[66] 
Id. at 375B76, 378.





[67] 
Case Concerning the Vienna Convention on Consular Relations (Para. v.
U.S.), Order of 10 November 1998 - Discontinuance.





[68] 
2001 I.C.J. 104 (June 27, 2001).





[69] 
2004 I.C.J. 128 (Mar. 31, 2004).





[70] 
LaGrand, 2001 I.C.J. 104, && 1, 10, 14.  





[71] 
Id. && 1, 38.





[72] 
LaGrand, 2001 I.C.J. 104, && 77, 90B91, 125.





[73] 
Id. & 128(7).





[74] 
Avena, && 106(1), 153(4).





[75] 
Id. && 106(2)B(3), 153(5)B(6). 





[76] 
Id. && 106(4), 153(7).





[77] 
Id. & 138.





[78] 
Id. && 138, 140B41.





[79] 
Id. & 139.





[80]  Presidential Memorandum.





[81] 
126 S. Ct. 620 (2005).





[82] 
126 S. Ct. 621 (2005).





[83] 
Sanchez-Llamas, 126 S. Ct. at 2677.





[84] 
Id.





[85] 
Id.





[86] 
Id. at 2682.





[87] 
Id. at 2687.





[88] 
Id. at 2683, 2685 (quoting Breard, 523 U.S. at 375).





[89] 
Id. at 2684.





[90] 
Id.





[91] 
Id.





[92] 
Id.





[93] 
Id.





[94] 
Id. at 2685 (original emphasis).





[95] 
Id. (quoting Kolovrat v. Oregon, 366 U.S. 187, 194
(1961)).





[96] 
Id. 





[97] 
Id. 





[98] 
Id. (quoting Breard, 523 U.S. at 375).





[99] 
Id.





[100] 
Id. 





[101] 
Vienna Convention, art. 36(2).





[102] 
Sanchez-Llamas, 126 S. Ct. at 2685.





[103] 
Id. at 2685B86.





[104] 
Id. at 2686.





[105]  Id. 





[106] 
Id.





[107]  Id. (quoting Vienna Convention, art.
36(2)).





[108] 
See generally 44 U.S.C. '' 1502, 1504, 1505(a)(1) (2000) (including APresidential proclamations and
Executive orders, except those not having general applicability and legal
effect or effective only against Federal agencies or persons in their capacity
as officers, agents, or employees thereof . . .@ as documents that must be
published in the Federal Register); 1 C.F.R. _ 1.1 (ADocument having general
applicability and legal effect means any document issued under proper authority
prescribing a penalty or course of conduct, conferring a right, privilege,
authority, or immunity, or imposing an obligation, and relevant or applicable
to the general public, members of a class, or persons in a locality, as
distinguished from named individuals or organizations . . .@); 1 C.F.R. _ 5.2(a) (including APresidential proclamations and
Executive orders in the numbered series, and each other document that the
President submits for publication or orders to be published@ among documents that are required
to be filed for inspection with the Federal Register and published in the
Federal Register).





[109] 
Br. of Respondent at 41.





[110] 
See Kevin M. Stack, The Statutory President, 90 Iowa L. Rev. 539, 546B47 (2005) (observing that Athere [are no] legal requirements
on the types of directives that the president must issue as an executive order,
as opposed to other headings, such as a proclamation, memorandum, directive, or
determination@ and stating that Athe particular form in which a
directive is conveyed does not determine its legal effect, and may reflect
nothing more than a bureaucratic choice.@); Tara L. Branum, President or King: The Use and Abuse
of Executive Orders in Modern-Day America, 28 J. Legis. 1, 6B7 (2002) (stating that Aa congressional study has defined executive orders as >directives or actions by the
President= that have the >force and effect of law= when >founded on the authority of the
President derived from the Constitution or a statute=@ as well as noting that in addition
to orders, A[p]residents may also issue
proclamations, presidential signing statements, presidential memoranda, or
National Security Presidential Directives, among other types of presidential
directives@ and stating, A[i]n general, however, the
difference is typically one of form, not substance.@); see also Youngstown Sheet
& Tube Co. v. Sawyer, 343 U.S. 579, 583 (1952).





[111] 
United States v. Belmont, 301 U.S. 324, 330 (1937); U.S. Const. amend. X; see also
Curtiss-Wright, 299 U.S. at 316.





[112] 
Curtiss-Wright, 299 U.S. at 315B16; see also Belmont, 301
U.S. at 330.





[113] 
Curtiss-Wright, 299 U.S. at 318 (quoting Burnet v. Brooks,
288 U.S. 378, 396 (1933)); see also Pink, 315 U.S. at 233 (APower over external affairs is not
shared by the States; it is vested with the national government exclusively.@); Hines v. Davidowitz, 312
U.S. 52, 63 (1941) (AThe federal Government . . . is
entrusted with full and exclusive responsibility for the conduct of affairs
with foreign sovereignties.@).





[114] 
Curtiss-Wright, 299 U.S. at 320.





[115] 
Id.





[116] 
Am. Ins. Ass=n v. Garamendi, 539 U.S. 396, 415 (2003) (Athe President has authority to make
>executive agreements= with other countries, requiring no
ratification by the Senate or approval by Congress[.]@); Dames & Moore, 453
U.S. at 682 (Aprior cases of this Court have also
recognized that the President does have some measure of power to enter into
executive agreements without obtaining the advice and consent of the Senate.@); Belmont, 301 U.S. at 331.





[117] 
Garamendi, 539 U.S. at 416; Pink, 315 U.S. at 230 (AA treaty is a >Law of the Land= under the supremacy clause (art.
VI, Cl. 2) of the Constitution.  Such
international compacts and agreements as the Litvinov Assignment have a similar
dignity.@).





[118] 
Garamendi, 539 U.S. at 419 (quoting Zschernig v. Miller,
389 U.S. 429, 440 (1968)).





[119] 
Youngstown Sheet & Tube Co., 343 U.S. at 585.





[120] 
Id. at 635B38 (Jackson, J., concurring).





[121] 
Id. at 635.





[122] 
Id.





[123] 
Id.





[124] 
Id. at 637.





[125] 
Id.





[126] 
Id.





[127] 
Id. 





[128] 
Id. 





[129] 
Id.





[130] 
Id.





[131] 
Id. at 638.





[132] 
Presidential Memorandum.





[133] 
Id. at 634; Dames & Moore, 453 U.S. at 661 (Athe decisions of the Court in this
area have been rare, episodic, and afford little precedential value for
subsequent cases.@).





[134] 
Presidential Memorandum.





[135] 
Sanchez-Llamas, 126 S. Ct. at 2684 (quoting Marbury v. Madison,
5 U.S. 137, 177 (1803)).





[136] 
Id. 





[137] 
301 U.S. 324.





[138] 
315 U.S. 203.





[139] 
453 U.S. 654.





[140] 
539 U.S. 396.





[141] 
301 U.S. at 325B26.





[142] 
Id. at 326.





[143] 
Id. 





[144] 
Id.; Pink, 315 U.S. at 222B23 (discussing its previous holding
regarding the Litvinov Assignment in Belmont).





[145] 
Belmont, 301 U.S. at 330.





[146] 
Id. at 327.





[147] 
Id. at 330B31.





[148] 
Id. at 331.





[149] 
315 U.S. at 227B34.





[150] 
Id. at 211.





[151] 
Id. at 234.





[152] 
Id. at 227.





[153] 
Id. at 230. 





[154] 
Id.





[155] 
Id. at 230B31.





[156] 
Id. at 233.





[157] 
453 U.S. at 662B63 (quoting Exec. Order No. 12170,
3 C.F.R. 457 (1980), note following 50 U.S.C. ' 1701 (1976 ed. Supp. III)).





[158] 
Id. at 665.





[159] 
Id.





[160] 
Id.





[161] 
Id. at 665B66 (quoting Exec. Order No. 12279,
46 Fed. Reg. 7919 (1981)).





[162] 
Id. at 666 (quoting Exec. Order No. 12294, 46 Fed. Reg. 14111
(1981)).





[163]  Id. at 666B67.





[164] 
Id. at 667.





[165] 
Id. at 668.





[166] 
Id. at 674 (quoting Youngstown Sheet & Tube Co., 343
U.S. at 637 (Jackson, J., concurring)).





[167] 
Id. (citing Youngstown Sheet & Tube Co., 343
U.S. at 636B37 (Jackson, J., concurring)).





[168] 
Id. at 675.





[169]  Id. at 677.





[170] 
Id.





[171] 
Id. at 678.





[172] 
Id. 





[173] 
Id. (quoting Youngstown Sheet & Tube Co., 343 U.S. at
637 (Jackson, J., concurring)).





[174] 
Id. at 679B80.





[175]  Id. at 680.





[176]  Id. at 680B81.





[177] 
Id. at 681.





[178] 
Id. at 682.





[179] 
Id. at 686.





[180] 
Id. at 687B88.





[181] 
539 U.S. at 405.





[182] 
Id.





[183] 
Id.





[184] 
Id. at 406.





[185] 
Id. at 407.





[186] 
Id. at 409.





[187] 
Id. (quoting Cal. Ins.
Code Ann. ' 13804(a) (West Cum. Supp. 2003)). 





[188]  Id. at 411.





[189] 
Id. at 411B12.





[190] 
Id. at 412.





[191]  Id. at 413.





[192] 
Id. at 414 (quoting Youngstown Sheet & Tube Co.,
343 U.S. at 610B11 (Frankfurter, J., concurring)).





[193] 
Id. at 415.





[194] 
Id. at 415B16.





[195] 
Id. at 417 (discussing Zschernig, 389 U.S. 429).





[196] 
389 U.S. at 430, 432, 436.





[197]  Garamendi, 539 U.S. at 417 (quoting Zschernig,
389 U.S. at 432).





[198] 
Id. at 418.





[199] 
Id. (quoting Zschernig, 389 U.S. at 459 (Harlan, J.,
concurring)).





[200] 
Id. at 419B20.





[201] 
Id. at 420.





[202] 
Id. at 421.





[203] 
Id. at 422B23.





[204] 
Id. at 425.





[205] 
Id. at 426.





[206] 
Id. 





[207] 
Id. at 423B24.





[208] 
Id. at 424 (quoting Crosby v. Nat=l Foreign Trade Council, 530 U.S. 363, 377 (2000)).





[209] 
Id. at 425 (quoting Crosby, 530 U.S. at 380).





[210]  U.S. Const. art. II, ' 1, cl. 1.





[211] 
Garamendi, 539 U.S. at 415.





[212] 
See Youngstown Sheet & Tube Co., 343 U.S. at 610B11 (Frankfurter, J., concurring)
(stating that Aa systematic, unbroken, executive
practice, long pursued to the knowledge of the Congress and never before
questioned, engaged in by Presidents who have also sworn to uphold the
Constitution, making as it were such exercise of power part of the structure of
our government, may be treated as a gloss on >executive power= vested in the President by ' 1 of Art. II.@).





[213] 
Id. at 635 (Jackson, J., concurring); see also Dames &
Moore, 453 U.S. at 686 (APast practice does not, by itself, create power, but >long-continued practice, known to
and acquiesced in by Congress, would raise a presumption that the action had
been taken in pursuance of its consent . . . .=@) (quoting United States v.
Midwest Oil Co., 236 U.S. 459, 474 (1915)). 





[214] 
Youngstown Sheet & Tube Co., 343 U.S. at 637 (Jackson, J.,
concurring).





[215] 
Garamendi, 539 U.S. at 415.





[216] 
Youngstown Sheet & Tube Co., 343 U.S. at 637 (Jackson, J.,
concurring).





[217] 
Id.





[218] 
Id.





[219] 
Br. of United States as Amicus Curiae, at 30 (quoting Garamendi,
539 U.S. at 416).





[220] 
Id. 





[221] 
U.S. Const. art. II, ' 3.





[222] 
Br. of Applicant at 50.





[223] 
Id. at 45.





[224] 
Sanchez-Llamas, 126 S. Ct. at 2685 (quoting Breard, 523
U.S. at 375).





[225] 
Id. at 2684B85.





[226] 
Youngstown Sheet & Tube Co., 343 U.S. at 587.





[227] 
Br. of Applicant at 48 (citing U.S.
Const. art. II, '' 2, cl. 2, 3).





[228] 
Id.





[229] 
Id. at 49 (citing 22 U.S.C. '' 1732, 4802(a)(1)(D)).





[230] 
U.S. Const. art. II, ' 2, cl. 2.





[231] 
U.S. Const. art. II, ' 3.





[232] 
22 U.S.C. _ 1732 (2000).





[233] 
22 U.S.C. ' 4802(a)(1)(D) (2000).





[234] 
453 U.S. at 676 (internal citations omitted).





[235] 
Id. at 678.





[236] 
Id. at 677.





[237] 
Id. at 678B79.





[238] 
Id. at 677B82, 686.





[239] 
Id. at 680.





[240] 
22 U.S.C. ' 2651 (2000) (AThere shall be at the seat of
government an executive department to be known as the >Department of State=, and a Secretary of State, who
shall be the head thereof.@).





[241] 
22 U.S.C. ' 4802(a)(1)(D).





[242] 
Br. of United States as Amicus Curiae, at 20B21 (quoting Garamendi, 539
U.S. at 415).





[243] 
Id. at 20.





[244] 
Id. (quoting 22 U.S.C. ' 287(a), (b) (2000)).





[245] 
22 U.S.C. ' 287(a), (b).





[246] 
Curtiss-Wright Export Corp., 299 U.S. at 320.





[247] 
Sanchez-Llamas, 126 S. Ct. at 2685.





[248]  Youngstown Sheet & Tube Co., 343 U.S.
at 585.





[249] 
Tex. Code Crim. Proc. art.
11.071 ' 5(a)(1).





[250] 
Tex. Code Crim. Proc. art.
11.071 ' 5(e).





[251]  Boykin v. State, 818 S.W.2d 782, 785 (Tex.
Crim. App. 1991).





[252] 
Id.





[253]  Nguyen v. State, 1 S.W.3d 694, 696 (Tex.
Crim. App. 1999).





[254] 
Boykin, 818 S.W.2d at 785.





[255] 
Id.





[256] 
Id.





[257] 
Id. at 785B86.





[258] 
Tex. Code Crim. Proc. art.
3.01 (Vernon 2004).





[259]  Tex. Gov=t Code '' 311.002, 311.011 (Vernon 2003).





[260] 
Tex. Code Crim. Proc. art.
3.01.





[261]  Tex. Gov=t Code ' 311.011(a).





[262] 
Ex parte Rieck, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004); Lane
v. State, 933 S.W.2d 504, 515 n.12 (Tex. Crim. App. 1996) (citing Bingham
v. State, 913 S.W.2d 208, 209B10 (Tex. Crim. App. 1995)) (reaffirming Athat use of dictionary definitions
of words contained in the statutory language is part of the >plain meaning= analysis that an appellate court
initially conducts [under Boykin] to determine whether or not the
statute in question is ambiguous.@).





[263] 
Webster=s Third
New International Dictionary 813 (2002).





[264] 
A Dictionary of Modern American
Usage 284 (1998).





[265] 
Id. at 284B85 (original emphasis).





[266]  See Webster=s Third
New International Dictionary 813 (2002); The American Heritage College Dictionary 489
(3d ed. 2000); Black=s Law
Dictionary 610 (7th
ed. 1999); A Dictionary of Modern Legal
Usage 346 (2d ed. 1995); The
Random House Dictionary of the English Language 691 (2d ed. 1987); A Concise Dictionary of Law 144 (1983);
Jowitt=s
Dictionary of English Law 764 (2d ed. 1977); Ballentine=s Law
Dictionary 449 (3d ed.
1969).





[267] 
Webster=s Third
New International Dictionary 813. 





[268] 
Tex. Gov=t Code ' 311.011; Lane, 933 S.W.2d
at 515 n.12.





[269] 
Black=s Law
Dictionary 610.





[270] 
See, e.g., Roper v. Simmons, 543 U.S. 551, 568 (2005) (AA majority of States have rejected
the imposition of the death penalty on juvenile offenders under 18, and we now
hold this is required by the Eighth Amendment.@); Crawford v. Washington,
541 U.S. 36, 68 (2004) (Athe Sixth Amendment demands what
the common law required: unavailability and a prior opportunity for
cross-examination.@); Atkins v. Virginia, 536
U.S. 304, 321 (2002) (AConstruing and applying the Eighth
Amendment in the light of our >evolving standards of decency,= we therefore conclude that such
punishment is excessive and that the Constitution >places a substantive restriction on
the State=s power to take the life= of a mentally retarded offender.@); Apprendi v. New Jersey,
530 U.S. 466, 490 (2000) (holding that under the Fifth, Sixth and Fourteenth
Amendments, A[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the prescribed
statutory maximum must be submitted to a jury, and proved beyond a reasonable
doubt.@).





[271] 
Ex parte Medellín, No. WR-50,191-01 (Tex. Crim. App. Oct. 3,
2001) (not designated for publication).





[272] 
Id.





[273] 
Sanchez-Llamas, 126 S. Ct. at 2682.  





[274] 
Br. of Applicant at 54.





[275] 
Id. 





[276] 
Presidential Memorandum.





[277] 
A Dictionary of Modern American
Usage 284 (1998).





[278] 
Black=s Law
Dictionary 610.





[279] 
Tex. Code Crim. Proc. art.
11.071 ' 5(d).





[280]  Boykin, 818 S.W.2d at 785.





[281] 
Tex. Code Crim. Proc. art.
11.071 ' 5(d).





[282] 
Sanchez-Llamas, 126 S. Ct. at 2687.





[283] 
Id. at 2683 (quoting Breard, 523 U.S. at 375).